Patrick CONWAY, Appellant

v.

**DELAWARE AND HUDSON RAILWAY COMPANY., INC., d/b/a Canadian Pacific Railway, a/k/a CP Rail System, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 13, 2005.

Filed Sept. 12, 2006.

Reargument Denied Nov. 13, 2006.

Gerald Marillotti, Philadelphia, for appellant.

Thomas A.P. Hayden, Canonsburg, for appellee.

BEFORE: FORD ELLIOTT, STEVENS, JJ., and McEWEN, P.J.E.

OPINION BY STEVENS, J.:

¶1 This is an appeal from the judgment[1] entered by the Court of Common Pleas of Luzerne County after the jury returned a defense verdict in Appellant's personal injury case alleging injuries compensable under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* ("FELA").[2] Appellant claims, among other things, that the trial court issued erroneous jury instructions and verdict interrogatories that applied Pennsylvania law rather than federal law on the defense of release in a FELA case. For the following reasons, we affirm.

¶2 The relevant facts and procedural history show that, on July 26, 1997, Appellant was working in the scope of his employment as engineer for Appellee railway when another train collided with his at Binghamton Yard in New York. Claiming the accident caused permanent and disabling injury to his lumbar and cervical spine, Appellant filed his first lawsuit under FELA in the United States District Court for the Middle District of Pennsylvania, where he won a jury verdict in early 1999.

¶3 After verdict, the parties executed a February 4, 1999 settlement agreement whereby Appellant received $500,000.00 in exchange for releasing Appellee from liability for all other work-related injuries. The release at issue provides, in relevant part:

In consideration of the payment to me receipt and apportionment of which is hereby acknowledged and agreed upon as indicated below, I, Patrick[ ] Conway hereby release and discharge the Delaware and Hudson Railway Company, Inc. [et. al.] from all liability for all claims listed in this release, and all injuries to my person, whether temporary or permanent, including presently known injuries as well as injuries that may be unknown at this time and which may be discovered subsequently and including the consequences and effects of all such injuries, whether known and expected, or unknown and unexpected, or temporary or permanent, received on or about July 26, 1997, at or near Binghamton, N.Y. while employed as a(n) Engineer and also including all past, present and future hearing loss, tinnitus, impairment, illness, disease or injury arising from, caused by, or attributable to exposure to noise, sound or other trauma while working as an employee of the parties hereby released and discharged and for any and all other occupational

---

1. We have corrected the caption to reflect that the appeal is from the February 2, 2005 judgment entered on the record, not from the November 17, 2004 order denying Appellant's motion for post-trial relief. *See Carpinet v. Mitchell,* 853 A.2d 366 (Pa.Super.2004).

2. In 1908, FELA was enacted "to enable injured railroad workers to overcome a number of traditional defenses to tort liability that had previously operated to bar their actions." *Wicker v. Conrail,* 142 F.3d 690, 696 (3rd Cir.1998) (citation omitted). Section 5 of

FELA, central to the present case, was passed specifically to remedy the problem of railroads insisting on employment contracts with their employees discharging the company from liability for personal injuries. *Id.* Section 5 of FELA provides:

Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable the common carrier to exempt itself from any liability created by this chapter, shall to that extent be void. . . .

45 U.S.C. § 55 (1986).

exposure, hazards, diseases or illnesses while employed by the parties hereby released and discharged, to the extent same are presently known to exist, and I hereby fully release and discharge the parties above named from all claims of every kind whatsoever which I now or may hereafter have on account of the matter described, and from all claims of every kind and nature, however arising, and I hereby acknowledge full satisfaction thereof.

\* \* \*

It is expressly understood and agreed that said payment is made in compromise of all said claims; that said compromise does not constitute any admission of liability by the parties hereby released; [and] that the payment aforesaid constitutes the sole consideration for this release....

Release dated 2/4/99 at 1–2.

¶ 4 Less than four months later, on June 15, 1999, Appellant filed the present civil complaint in Luzerne County. Asserting a cause of action arising under, among other things, FELA, the complaint alleged that Appellant developed repetitive stress disorders, namely carpal tunnel syndrome, as a result of Appellee's "repeated operation of unsafe, improperly maintained and defective railroad switches and other equipment as well as engaging in other job-related activities." Complaint dated 6/15/99 at 2. After Appellee filed its Answer and New Matter, to which Appellant filed his Answer, the trial court was presented with Appellee's Motion for Summary Judgment, in which Appellee argued that Appellant's present claim was barred as a matter of law by the parties' prior settlement and release agreement.

¶ 5 In denying Appellee's Motion for Summary Judgment, the Honorable Hugh F. Mundy determined that genuine issues of material fact existed when the case was reviewed under the controlling Third Circuit Court of Appeals' decision in *Wicker v. Conrail*, 142 F.3d 690 (3rd Cir.1998), *cert denied*, 525 U.S. 1012, 119 S.Ct. 530, 142 L.Ed.2d 440 (1998). *Wicker* addressed whether a release violated Section 5 of FELA and its remedial goals if the release not only related to actual injuries known at the time of signing, but also extended to *risks* of future injury known at the time of signing. Reasoning that "the parties may want to settle controversies about potential liability and damages related to known risks even if there is no present manifestation of injury[,]" the Third Circuit held that

a release does not violate § 5 provided it is executed for valid consideration as part of a settlement, and the scope of the release is limited to those risks which are known to the parties at the time the release is signed. Claims relating to unknown risks do not constitute 'controversies,' and may not be waived under § 5 of FELA.

*Id.* at 700–01. *Accord Wolf v. Consolidated Rail Corp.*, 840 A.2d 1004 (Pa.Super.2003) (holding that compromise of future, unspecified and unknown claims is improper under FELA, and to the extent the release purports to do so, it is invalid).

¶ 6 While a release chronicling the scope and duration of the known risks would conceivably supply strong evidence in support of the release defense, broad and highly detailed boilerplate agreements are too easily drafted, the Third Circuit noted. Therefore, the *Wicker* court determined that the written release may be strong, but not conclusive, evidence as to what risks were known and intended to be released. The evaluation of knowledge and intent at the time of the agreement ultimately remains "a fact-intensive process, [and] trial courts are competent to make these kinds of determinations." *Id.* at 701.

¶ 7 The genuine issue of fact in the present case, according to Judge Mundy, was whether Appellant knew at the time he released Appellee from liability for his work-related injuries that the upper extremity symptoms he was already experiencing were causally connected to his engineer work, even if he did not yet know what actual disorder was involved. Discovery showed Appellant's claim to be that it was only after he signed the release that he learned his symptoms were caused by work-related repetitive stress disorder or carpal tunnel syndrome. Appellee's contrary position was that Appellant knew both the work-related cause and the diagnosis before he signed the release. Therefore, Appellee's Motion for Summary Judgment was denied, and the case proceeded to jury trial.

¶ 8 Trial commenced on June 28, 2004, and the jury heard extensive testimony from Appellant about the high physical demands that his 21–year tenure as engineer with the railway placed on his torso and extremities. In this regard, Appellant emphasized that a train's air brakes, throttle, whistle and other instruments involved in controlling locomotion were controlled by hand, and required constant attention while traversing the mountainous route he traveled between Allentown and Binghamton. Certain maintenance duties fell unto the engineer as well, Appellant explained, and oftentimes required him to handle, lift, repair, or replace heavy train components.

¶ 9 Appellant testified that he started having problems with his hands and arms in "probably 1999," although he admitted to having had "a lot of symptoms, but I didn't pay much attention to them because I was doing other stuff." N.T. 6/28/04 at 45. A critical portion of his testimony pertained to a January 28, 1999 diagnostic electromyogram ("EMG"), performed one week before Appellant signed the release,

which showed he had carpal tunnel syndrome. Appellant asserted, however, that he did not know the results of the EMG until after he signed the release. Cross-examination challenged his assertion as follows:

COUNSEL: Don't you recall telling me, sir, under oath that you were told at the time you had the test that you had carpal tunnel syndrome?
* * *

APPELLANT: I don't recall.
* * *

COUNSEL: You testified to me previously that you had instructed your attorney not to tell the representative of the railroad that you had this carpal tunnel test and that it was positive, correct?
APPELLANT: Did I? I can't recall. I'd have to read the deposition.
COUNSEL: Let's do that.
* * *

APPELLANT: (Reading the deposition transcript) You're asking me, did I tell [the railroad representative] specifically that I had the test, and I said, 'no.'
* * *

COUNSEL: Page 85, sir, Line 11. I asked you again why you withheld the information from [the railroad representative.] I said:
"Why didn't you bring that to [the railroad representative's] attention at the time you were releasing all claims and resigning from service from the railroad?
Answer: I didn't feel he needed to know. It's like if we were playing cards, I wouldn't tell you what I had in my hand."
* * *

COUNSEL: Sir, I'm going to refer back to the deposition I took of you previously. I'm going to refer you to Page 73, Line 12:

"Question: I'm going to show you the original." Meaning the release.

"Answer: The original was modified.

Question: Well, you tell me how it was modified?

Answer: I had my counselor do it. Is this the same one we—" And then you continue. "Is that the one that says there's no carpal tunnel syndrome? That's it, I guess, because I asked him before I signed the release, 'Is there anything in this about carpal tunnel[?]' He said 'No.' I said, 'Okay, I'll sign it.'

Question: Why did you ask that question about carpal tunnel being in there?

Answer: When was this dated, February 4th? January I had that test done.

Question: Okay.

Answer: I said, 'If I have carpal tunnel, you know, we'll see what to do with that next.

Question: Who [sic] did you say that to?

Answer: My counselor here. **I told him I had the test done and it came back positive. And I says, 'when we come up with the release,' I said, 'see if there's anything in there about carpal tunnel.'** "

Did I read that accurately?

**APPELLANT:** Pretty much.

N.T. 6/28/04 at 76, 77–78, and 98–99 (emphasis added).

¶ 10 With testimony completed, but before closing arguments, the trial court instructed the jury on applicable law. To the issue of whether Appellant had released the railway from liability for the work-related injury he presently claimed, the court instructed the jury as follows:

**THE COURT:** ... The Defendant denies that it was negligent and further maintains that as a result of the [Plaintiff] signing a release in February of 1999, when he knew or should have known of the injuries, if any, to his upper extremeties and that they were related to his job, there's no liability on their part for this action.

Based upon the evidence presented, the issues you have to decide are whether the Plaintiff knew he had upper extremity disorders and that those disorders were related to his job when he executed the release on February 4, 1999.

* * *

As I just indicated, one of the issues you have to decide in this case is whether the Plaintiff knew he had upper extremity disorders and that those disorders were related to his job when he entered into the party's February 4th, 1999 release.

If you determine that Plaintiff knew of his upper extremity disorders and that they were related to his job when he executed the release on February 4th, 1999, then under the law of this Commonwealth, you must find for the Defendant.

N.T. 7/1/04 at 321–22, 323–24.

¶ 11 Afterward, Appellant raised the following objection to the instruction on the release:

**COUNSEL:** On behalf of Plaintiff, we would again renew our objection to the inclusion of the release as part of the jury instruction and also as part of the charge.

Secondly, we also object to the fact that there is—if the Court deems it relevant for the jury as an issue of fact—that there was not a separate question as to whether it was specifically as bargained by the parties to the original release.

N.T. 7/1/04 at 375–76.[3] The objection was overruled, and the case was handed to the

---

**3.** Appellee argues that Appellant failed to preserve his present claim with a timely

jury, who deliberated one hour before returning with a defense verdict. The issue of negligence was never reached, for the jury's affirmative answer to the first question on the Jury Verdict Interrogatories, namely, "Do you find that Plaintiff was aware of his upper extremities disorders and that they were related to his job on or before February 4, 1999?", was a determination that Appellant had released the railway from liability for the known work-related injuries of which he complained.

¶ 12 On appeal, Appellant claims the instruction and accompanying interrogatory were fatally flawed because they did not require the jury to determine whether the release reflected the parties' intent to release liability for the particular injuries at issue. The validity of a release in a FELA case turns on the parties' intent, Appellant argues, and waiver of a claim therein may not be established without a determination of that intent. Though we agree that a release of FELA claims must reflect the parties' intent, jurisprudence has clearly inferred intent from what the parties knew about either work-related injuries or risks of work-related injuries when they negotiated and, ultimately, executed the release.

¶ 13 Indeed, the Third Circuit in *Wicker* set out to determine whether employees intended to release an employer from future claims relating to worksite exposure to toxic chemicals precisely by examining whether the employees actually knew on the day they signed the release that they had, in fact, been so exposed and that such exposure was connected to their symptoms. The Court reviewed the detailed, blanket releases and determined that:

the releases did not demonstrate the employees knew of the actual risks to which they were exposed and from which employer was being released.... Although plaintiffs testified they were aware of certain symptoms when they signed the releases, the record does not demonstrate that they knew that these symptoms were related to their exposure to toxic chemicals at [employer's] plant. To the contrary, plaintiffs testified that they did not connect the symptoms with their chemical exposure until after they had signed the releases, and that they were not aware of the risks associated with the various chemicals used at [employer's] facility. Therefore, the releases could not have settled claims with respect to those risks, and cannot bar plaintiff's claims.

As noted, we hold that § 5 of FELA allows an employer to negotiate a release of claims with an employee provided the release is limited to those risks which are known by the parties at the time the release is negotiated.

*Wicker*, 142 F.3d at 701–02. What the employees knew on the day they signed their respective releases, therefore, determined whether the releases barred their FELA claims.

 ¶ 14 In the case at bar, therefore, there was no legal error in applying *Wicker* and instructing the jury that Appellant's knowledge determined the validity and applicability of the release. Moreover, a strong factual basis existed for the instruction, for the evidence certainly permitted the jury to find that Appellant knew on the day he negotiated his release that his upper extremity symptoms stemmed from a

---

and specific objection that the parties' intent behind the release was a necessary jury consideration mistakenly absent from the instruction. We find, however, that Appellant's objection that the instruction did not reflect what the parties bargained for was tantamount to objecting that the instruction did not reflect the parties' intent. Accordingly, we deem his claim preserved.

work-related repetitive stress disorder. Appellant's own deposition established that he knew he had carpal tunnel syndrome and believed it was work-related prior to negotiating his release. Though Appellant apparently verified with his lawyer that the release did not specifically list carpal tunnel syndrome, the plain language of the release nevertheless did include all known injuries resulting from work-related trauma. Appellant's carpal tunnel syndrome fell under this category of known work-related injuries.

¶ 15 Under FELA jurisprudence, to the extent a release of claims relates to work-related injuries or risks of injuries known to the employee at the time he signs the release, it does not violate FELA or its remedial goals. Consequently, it was proper for both the jury instruction and verdict interrogatories to condition the validity and applicability of the release in question on Appellant's knowledge at the time of signing. Based on the evidence before it, the jury determined that the negotiated release barred Appellant's claim. We find no reversible error in this result.

¶ 16 Judgment is affirmed.[4]

---

4. Finding no error with the verdict that the release barred Appellant's FELA claim, we need not address the remaining evidentiary issues relating to the railway's purported negligence.