**Henry CALLAHAN,**

v.

**NATIONAL RAILROAD PASSENGER CORP. ("Amtrak"), Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 24, 2009.

Filed July 14, 2009.

---

Gerald T. Ford, Newark, N.J., for appellant, Pro Hac Vice.

Robert St. L. Goggin, III, Philadelphia, for appellee.

BEFORE: ORIE MELVIN, BOWES and DONOHUE, JJ.

OPINION BY ORIE MELVIN, J.:

¶ 1 Appellant, National Railroad Passenger Corp. (hereafter Amtrak) appeals from the judgment entered following a jury verdict in favor of Appellee, Henry Callahan (hereafter Callahan). After careful review, we affirm.

¶ 2 The trial court aptly summarized the factual background in this matter as follows.

> Plaintiff Callahan sustained bodily injuries on April 20, 2004, in the course of his employment as an Electric Traction lineman with Defendant Amtrak. [Callahan] suffered injuries to his legs, feet and back when he fell approximately 40 feet from a catenary pole at or near the Richmond substation in Philadelphia.
>
> When climbing the pole, [Callahan] had to climb the first 20 feet using a device called skates. At the 20 foot mark, a ladder begins and continues to the remainder of the pole. At the 40 foot mark, there is a gap in the ladder's rungs which require the climber to use a bolt head [or step bolt], measuring 1.5 inches, for footing. On April 20, [Callahan] was able to climb up the pole without incident; however, [Callahan] fell while climbing down the pole. [Callahan] argued that the gap in the ladder threw him off balance and he fell 40 feet hitting the ground below.

Trial Court Opinion, 6/6/08, at 1–2.

¶ 3 Callahan filed suit against Amtrak, and the matter proceeded to trial in January 2007. Pertinent to this appeal are several rulings by the trial court. First, the trial court permitted an expert witness for Callahan to testify regarding provisions of the Occupational Safety and Health Act (OSHA)[1] and also instructed the jury on its consideration of those provisions with respect to Amtrak's alleged negligence. Additionally, the trial court denied Amtrak's request for special interrogatories regarding the jury's calculation of damages, and excluded certain testimony on Callahan's future economic loss over Amtrak's objection. At the conclusion of the trial, the jury found in favor of Callahan against Amtrak but also found Callahan to be 30% contributorily negligent. Both parties' post-trial motions were denied, and the trial court entered judgment on the molded verdict in the sum of $3.15 million. This timely appeal followed.[2]

¶ 4 Amtrak presents two issues for our review:

1. Is a new trial required because plaintiff's liability expert was allowed to testify regarding defendant's alleged violations of OSHA regulations that do not apply to the facts of this case and because the Trial Court charged the jury that those regulations do apply and could support a finding of liability?

2. Is a new trial required because of the erroneous and unfair manner in which the Trial Court handled plaintiff's claim for future economic loss?

Appellant's brief at 4.

¶ 5 We begin our review by observing our standard of review.

> In reviewing a trial court's decision to grant or deny a motion for a new trial, it is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial. Moreover, [a] new trial is not warranted merely

---

1. 29 U.S.C. §§ 651–678.

2. Appellant and the trial court have complied with Pa.R.A.P. 1925.

because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake.

*Bednar v. Dana Corp.*, 962 A.2d 1232, 1235 (Pa.Super.2008) (citations and internal quotation marks omitted).

¶ 6 Amtrak's first claim is that OSHA regulations had no application to this case because its provisions were preempted by a policy statement of the Federal Railroad Administration (FRA). As such, Amtrak argues, the trial court erred in permitting testimony about OSHA regulations and in instructing the jury that it could consider those regulations in evaluating whether Amtrak was negligent. For the following reasons, we disagree with Amtrak's contentions.

¶ 7 Callahan filed this action against Amtrak pursuant to the Federal Employers' Liability Act (FELA),[3] claiming that Amtrak was negligent in various respects and that Callahan sustained injury as a result. Complaint, ¶¶ 3–13 (Certified Record (C.R.) at 1). On the second day of trial, Amtrak moved *in limine* seeking, *inter alia*, to preclude Callahan from introducing evidence on OSHA regulations,[4] and the trial court entertained argument on the motion. N.T. Trial, 1/17/07, at 26–45. The trial court denied the motion *in limine. Id.* at 44–46. Callahan's next witness was Vincent Gallagher whom he of-

fered as an expert in "OSHA's policies and procedures, OSHA standards, the principles and practices of safety management, [and] the principles and practices of fall safety control." *Id.* at 60. Counsel for Amtrak proceeded with cross-examination of Gallagher's qualifications and objected to his status as an expert. The trial court accepted Mr. Gallagher as an expert as proffered. *Id.* at 81. He testified that three specific OSHA regulations relating to ladder rung spacing and one regulation relating to fall protection for persons climbing ladders were applicable to the case.

¶ 8 Initially, we observe that "the admission of evidence rests within the sound discretion of the trial court and will only be reversed upon a showing that it abused its discretion." *Quinby v. Plumsteadville Family Practice, Inc.*, 589 Pa. 183, 212, 907 A.2d 1061, 1078 (2006). Additionally, "for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party." *Cave v. Wampler Foods, Inc.*, 961 A.2d 864, 869 (Pa.Super.2008) (citation omitted). Similarly,

> [t]he admission of expert testimony is a matter of discretion [for] the trial court and will not be remanded, overruled or disturbed unless there was a clear abuse of discretion. Indeed, admission of the disputed testimony must be shown to have been not only erroneous but also harmful.... Evidentiary rulings which did not affect the verdict will not provide

---

**3.** 45 U.S.C. §§ 51–60. "FELA was enacted 'to enable injured railroad workers to overcome a number of traditional defenses to tort liability that had previously operated to bar their actions.'" *Conway v. Delaware and Hudson Railway Co., Inc.*, 909 A.2d 6, 7 n. 2 (Pa.Super.2006) (quoting *Wicker v. Consolidated Rail*, 142 F.3d 690, 696 (3d Cir.1998), *cert. denied*, 525 U.S. 1012, 119 S.Ct. 530, 142 L.Ed.2d 440 (1998)), *appeal denied*, 593 Pa. 733, 929 A.2d 645 (2007). "Congress intend-

ed to establish a dependable tort remedy for railroad workers which would not only compensate them for their injuries but also encourage safety within the industry." *Ries v. Nat'l R.R. Passenger Corp.*, 960 F.2d 1156, 1158 (3d Cir.1992) (citation omitted).

**4.** There does not appear to be a corresponding written motion included in the certified record.

a basis for disturbing the jury's judgment.

*Betz v. Erie Ins. Exchange,* 957 A.2d 1244, 1258 (Pa.Super.2008) (citations and quotation marks omitted).

¶ 9 The FRA has the authority to carry out laws related to railroad safety pursuant to the Federal Railroad Safety Act (FRSA).[5] 49 U.S.C. §§ 103, 20103. This authority extends to prescribing regulations and orders related to railroad safety. 49 U.S.C. § 20103. It is not insignificant that the purpose of the FRSA "is to promote safety in *every area of railroad operations* and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101 (emphasis added).

■ ¶ 10 OSHA similarly provides a mechanism for ensuring safe and healthful working conditions in the United States. 29 U.S.C. §§ 651–678. Generally speaking, violation of OSHA regulations may be considered by a jury in determining whether an employer was negligent in a FELA action. *See, e.g., Ries v. Nat'l R.R. Passenger Corp.,* 960 F.2d 1156, 1162 (3d Cir.1992); *see also Birt v. Firstenergy Corp.,* 891 A.2d 1281, 1290 (Pa.Super.2006) (explaining that, "evidence of industry standards and regulations is generally relevant and admissible on the issue of negligence."). However, OSHA is expressly inapplicable "to working conditions of employees with respect to which other Federal agencies ... exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." 29 U.S.C. § 653(b)(1). Consistent with this directive, the FRA in 1978 issued a policy statement which provides in relevant part as follows.

OSHA regulations would not apply to ladders, platforms, and other surfaces on signal masts, catenary systems, rail-road bridges, turntables, and similar structures or to walkways beside the tracks in yards or along the right-of-way. These are areas which are so much a part of the operating environment that they must be regulated by the agency with primary responsibility for railroad safety.

43 Fed.Reg. 10,583, 10,587 (Mar. 14, 1978).

¶ 11 Both before and after issuance of that policy statement, courts have been asked to determine the extent to which OSHA regulations are preempted by FRA guidelines. *See, e.g., Southern Pacific Transportation Co. v. Usery,* 539 F.2d 386 (5th Cir.1976), *cert. denied,* 434 U.S. 874, 98 S.Ct. 221, 54 L.Ed.2d 154 (1977); *see also Assoc. of Amer. Railroads v. Dept. of Transportation,* 38 F.3d 582 (D.C.Cir. 1994). As one Court aptly stated, " FRA guidelines preempt *some* OSHA regulations." *Campbell v. Consolidated Rail Corp.,* 2009 WL 36889, *, 2009 U.S. Dist. LEXIS 803, *1 (N.D.N.Y.2009) (emphasis added). Even the FRA 1978 policy statement which Amtrak cites as authoritative support for its position recognizes that OSHA has application to "the occupational safety and health of railroad employee[s]." Policy Statement, 43 Fed.Reg. 10,583, 10,-585 (March 14, 1978).

¶ 12 In contending that the OSHA regulations in question are not applicable to the catenary pole and ladder in this case, Amtrak relies primarily on *Velasquez v. Southern Pacific Transportation Co.,* 734 F.2d 216 (5th Cir.1984). There, a railroad employee was working on a railroad bridge when he slipped and fell through an opening in the wooden walkway along the railroad track. The employee filed a FELA action against the railroad claiming it was negligent. The trial court determined that OSHA regulations requiring preventative

---

5. 49 U.S.C. §§ 20101–28505.

measures in such a situation were relevant, and permitted expert testimony on the subject in addition to instructing the jury that that the OSHA regulations were applicable. The Court of Appeals disagreed and reversed, holding that "OSHA standards do not apply to walkways along the tracks, or railroad bridges, because they have been displaced by" the above-quoted portion of the 1978 policy statement by the FRA. *Id.* at 218. The Court expressly determined that the OSHA regulations relating to walkways were preempted regardless of whether or not the FRA had implemented specific regulations on the subject. *Id.* The Court therefore reversed and remanded for a new trial.[6]

¶ 13 As Callahan observes, however, not all courts have applied the broad approach taken in *Velasquez.* In *Usery, supra,* another case on which Amtrak relies, the Court reasoned that the FRA and OSHA have "overlapping authority to regulate railroad safety, with displacement of OSHA coverage by the FRA dependent on unilateral action by the FRA" to exercise such authority. 539 F.2d at 389. Similarly, in *Manes v. Metro–North Commuter R.R.,* 801 F.Supp. 954 (D.Conn.1992), *aff'd mem.,* 990 F.2d 622 (2d Cir.1993), the Court concluded that "OSHA's negative pre-emption is only triggered where there is an actual, concrete assertion of authority," notwithstanding the FRA policy statement. *Id.* at 964. We find persuasive the reasoning set forth in *Assoc. of Amer. R.R., supra,* at 586, in rejecting an argument identical to that made by Amtrak, that "Congress did not contemplate that

there would be no regulation whatever while the FRA is still considering what road to take, nor does a single step down that road carry preemption further than that step itself." (citation omitted). For its part, the FRA has likewise indicated that it did not intend to displace OSHA regulations entirely. *Id.* at 588 (quoting Notice of Proposed Rulemaking, 56 Fed.Reg. 3434, 3435 (Jan. 30, 1991)).

¶ 14 Amtrak does not point to any regulation issued by the FRA which relates to catenary poles and ladders,[7] nor has our research discovered same. We simply cannot conclude that OSHA regulations addressing this subject are preempted by the FRA in the absence of any exercise of authority by the FRA in this respect. Such a determination would ignore the express purpose of the FRSA to promote safety in "every area of railroad operations" and reduce accidents. 49 U.S.C. § 20101. Accordingly, we reject Amtrak's contention that the FRA preempted any and all OSHA regulations in this case and, like the District of Columbia Court of Appeals, we hereby decline to adopt the broad interpretation set forth by the Fifth Circuit in *Velasquez.*

¶ 15 Having so concluded, we discern no abuse of the trial court's discretion in permitting Callahan to introduce evidence relating to the OSHA regulations in question through its expert. That conclusion does not end our discussion of the first issue, however, because Amtrak also contends that even if the OSHA regulations were not preempted, the trial court erred in instructing the jury that it should consider

---

**6.** *Velasquez* expressly declined to address "the issue of whether the introduction of OSHA regulations into evidence was reversible error." 734 F.2d at 219 n. 2. At least one federal district court has opined that evidence of OSHA regulations may be considered on the issue of reasonable care even where they have been preempted by the FRA policy state-

ment. *Miller v. Chicago and North Western Transportation Co.,* 925 F.Supp. 583, 588 (N.D.Ill.1996).

**7.** Amtrak conceded at trial that the FRA had not promulgated regulations regarding ladders. N.T. Trial, 1/17/07, at 44.

those regulations in evaluating whether Amtrak was negligent.

¶ 16 Amtrak contends that none of the cited OSHA regulations in question apply to it. As noted, three of those regulations pertain to spacing of ladder rungs including the placement of the step bolt and the rungs on either side and the fourth relates to the necessity for fall protection for workers using the equipment. The first challenged regulation is Section 1910.269(h) which is located in a subpart entitled "Special Industries" and provides as follows.

**§ 1910.269 Electric power generation, transmission, and distribution.**

\* \* \* \*

(h) Ladders, platforms, step bolts, and manhole steps.

(1) General. Requirements for ladders contained in Subpart D of this Part apply.

29 C.F.R. § 1910.269(h)(1).

¶ 17 Amtrak's second and related argument is that Section 1926.1053(a) is also not applicable. That subsection is in a subpart entitled "Construction" and provides as follows.

**§ 1926.1053 Ladders.**

(a) General. The following requirements apply to all ladders as indicated, including job-made ladders.

\* \* \* \*

(2) Ladder rungs, cleats, and steps shall be parallel, level, and uniformly spaced when the ladder is in position for use.

29 C.F.R.1926.1053(a)(2).

¶ 18 Amtrak argues that these two regulations are not applicable because it is not an electric utility and does not generate, transmit, or distribute electricity and also is not involved in the construction industry. Amtrak does not, however, explain how admission of evidence of these particular regulations caused it any harm or prejudice, and in fact Amtrak concedes that it elicited admissions from Mr. Gallagher on cross-examination which cast doubt on the applicability of these particular regulations. As such, we find no merit to Amtrak's claim that the trial court improperly permitted testimony about these first two regulations into evidence.

¶ 19 The crux of Amtrak's argument relates to the third challenged ladder regulation which provides in relevant part as follows.

**§ 1910.27 Fixed ladders.**

(b) Specific features—

\* \* \* \*

(ii) The distance between rungs, cleats, and steps shall not exceed 12 inches and shall be uniform throughout the length of the ladder.

29 C.F.R. § 1910.27(b). Amtrak asserts that the catenary pole is not a "ladder" and, thus, the requirements in Section 1910.27(b) should not have been considered by the jury.

¶ 20 The relevant regulation defines "ladder" as "an appliance usually consisting of two side rails joined at regular intervals by crosspieces called steps, rungs, or cleats, on which a person may step in ascending or descending." 29 C.F.R. § 1910.21(e)(1). While Amtrak makes much of the fact that the catenary pole lacked side rails, the definition itself contains the term "usually" which indicates that the language is not all-inclusive.[8]

---

8. We also find unpersuasive Amtrak's reference to an OSHA interpretation of its regula-

Amtrak buttresses its contention by citing to standards set forth by the American National Standards Institute (ANSI) which, it asserts, expressly do not apply to poles such as the catenary pole in this case. Amtrak does not point to the place in this voluminous record where it raised the ANSI standards as grounds for excluding evidence of the OSHA regulations, a violation of Pa.R.A.P. 2119, Argument, (c) Reference to record. As such, we could consider this contention unpreserved. *Warfield v. Shermer*, 910 A.2d 734, 739 n. 7 (Pa.Super.2006) (citations omitted), *appeal denied*, 591 Pa. 737, 921 A.2d 497 (2007). Moreover, the standards on which Amtrak relies have not been provided to this Court,[9] are not available to us as matters of public record,[10] and in any event could not be considered binding precedent.

¶ 21 The final OSHA regulation which Amtrak claims was erroneously introduced into evidence related to the design of the catenary pole and specifically requires a form of fall protection. That regulation provides in relevant part as follows.

§ 1910.269 Electric power generation, transmission, and distribution.

  (g) Personal protective equipment.

    (v) Fall arrest equipment, work positioning equipment, or travel restricting equipment shall be used by employees working at elevated locations more than 4 feet (1.2 m) above the ground on poles, towers, or similar structures if other fall protection has not been provided. Fall protection equipment is not required to be used by a qualified employee climbing or changing location on poles, towers, or similar structures, unless conditions, such as, but not limited to, ice, high winds, the design of the structure (for example, no provision for holding on with hands), or the presence of contaminants on the structure, could cause the employee to lose his or her grip or footing.

29 C.F.R. § 1910.269(g)(2)(v). As Amtrak observes, this regulation requires fall protection in circumstances where the design of the structure would pose a hazard for the climber in maintaining his grip or footing.

¶ 22 We find no merit to Amtrak's contentions regarding Mr. Gallagher's testimony about this regulation. First, as noted, the admission of expert testimony is a matter left to the sound discretion of the trial court. Additionally, whether a particular witness qualifies as an expert is also a matter within the trial court's discretion. *Kovalev v. Sowell*, 839 A.2d 359, 363 (Pa.Super.2003) (citations omitted), *appeal denied*, 580 Pa. 698, 860 A.2d 124 (2004). "It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one.

---

tions wherein it opined that 29 C.F.R. § 1910.269(h) does not apply to step bolts. Not only does OSHA acknowledge in the cited interpretation that the regulation itself refers to "step bolts," this document does not state that subsection 1910.269(h) is inapplicable to other rungs such as those on the catenary pole above and below the step bolt.

9. "[I]t remains the appellant's responsibility to ensure that a complete record is produced for appeal.... The failure of the appellant to

ensure that the original record certified for appeal contains sufficient information to conduct a proper review may constitute a waiver of the issues sought to be examined." *Warfield, supra*, at 739 n. 7.

10. The organization makes its standards available for purchase through its website, *www.ansi.org*, as does the American Ladder Institute, *www.americanladderinstitute.org*, to which Amtrak refers in the appendix to its brief.

When determining whether a witness is qualified as an expert the court is to examine whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation." *Id.* at 363 (citations omitted).

¶ 23 Based upon our review of this record, we agree with the trial court that evidence regarding this particular regulation was relevant and probative of the issues presented to the jury for resolution. As such, we fail to discern a clear abuse of the trial court's discretion. Contrary to Amtrak's argument, Mr. Gallagher clearly possessed the sort of specialized knowledge which was helpful to assist the jury in resolving the issues in this case. The mere facts that Mr. Gallagher is not an engineer and never designed or used a catenary pole are insufficient to render his expert testimony inadmissible. We also find the cases cited by Amtrak in support of its claim that Mr. Gallagher was not qualified are easily distinguishable in addition to lacking precedential authority. Furthermore, review of the record reveals that the trial court properly exercised its discretion in limiting the cross-examination of Mr. Gallagher and the direct examination of Mr. Verhelle to the issues presented in the case, and Amtrak's argument to the contrary merits no relief. *See Yacoub v. Lehigh Valley Medical Assoc., P.C.,* 805 A.2d 579, 592 (Pa.Super.2002) *(en banc)* (explaining that the scope and limits of cross-examination, including that of expert witnesses, are matters within the trial court's discretion), *appeal denied,* 573 Pa. 692, 825 A.2d 639 (2003); Pa.R.E. 702, Opinion testimony by lay witnesses (limiting witness testimony "in the form of opinions or inferences . . ." to those opinions or inferences which are rationally based on the perception of the witness, helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and not based on scientific, technical,

or other specialized knowledge); *McManamon v. Washko,* 906 A.2d 1259, 1274 (Pa.Super.2006) (observing that "[t]he basic requisite for the admission of any evidence is that it be both competent and relevant."), *appeal denied,* 591 Pa. 736, 921 A.2d 497 (2007).

¶ 24 To the extent that Amtrak claims the trial court's jury instructions were erroneous because the charge included reference to the above-challenged OSHA regulations, we also find no merit.

When examining jury instructions, we must determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. It is only when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue that error in a charge will be found to be a sufficient basis for the award of a new trial.

*Tindall v. Friedman,* 970 A.2d 1159 (Pa.Super 2009) (citations and quotation marks omitted). Our review finds that the trial court's charge to the jury, when viewed as a whole, accurately and completely conveyed the applicable law to the jury relative to the issues presented to it. Accordingly, we discern no abuse of the trial court's discretion.

¶ 25 Having determined that the contentions presented in Amtrak's first issue merit no relief on appeal, we turn to its second issue which challenges Callahan's claim for future economic loss. This argument is four-fold. The first claim relating to future economic loss is that the trial court erred in permitting Callahan's vocational expert, Rosalyn Pierce, to provide testimony on the effect of his use of a narcotic medication (Percocet) on possible employment, because this opinion was not included in this expert's report. Pa.R.C.P. 4003.5(c) does provide that the direct testi-

mony of an expert may not be inconsistent with or go beyond the fair scope of the materials which have been developed during discovery.

In deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." The question to be answered is whether, under the circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

*Sutherland v. Monongahela Valley Hosp.,* 856 A.2d 55, 59 (Pa.Super.2004) (citation omitted). We review a trial court's ruling on this type of issue for an abuse of discretion. *Id.*

¶ 26 Based upon our review of Ms. Pierce's testimony as well as her expert report, we are unable to conclude that the trial court abused its discretion. Amtrak was clearly on notice of Callahan's use of Percocet and the impact of that medication on his vocational opportunities, and Ms. Pierce's testimony in this regard was well within the fair scope of her report. Accordingly, we find no merit to this contention.

■■■ ¶ 27 The second, related prong of Amtrak's second issue is that the trial court erred in excluding evidence of its efforts to assist Callahan in obtaining substitute employment as a power director. The record reflects that, during trial, Amtrak sought to introduce evidence that Callahan was or could have been offered a position as an Amtrak power director, a sedentary job for which Callahan was qualified. Amtrak stipulated, however, that Callahan could not perform the duties of a power director while he was taking Percocet. N.T. Trial, 1/19/06, at 122. During direct examination of Amtrak's vocational expert, Stephanie DeSalvio, the trial court sustained Callahan's objection to any evidence that he had been offered a position as a power director and instead limited the inquiry to Amtrak's attempts to discuss a power director position with Callahan. N.T. Trial, 1/22/06, at 60–76. It also noted that Ms. DeSalvio was not a vocational expert. *Id.* at 73–75.

¶ 28 On appeal, Amtrak contends that the jury should have been permitted to consider whether Callahan could have worked as a power director which would have been relevant to the issue of whether he made an effort to mitigate his damages. Amtrak relies principally on *Yauch v. Southern Pacific Transp. Co.,* 198 Ariz. 394, 10 P.3d 1181 (2000), and *Mikus v. Norfolk & Western Railway Co.,* 312 Ill. App.3d 11, 244 Ill.Dec. 499, 726 N.E.2d 95 (.2000), in support of this contention.

¶ 29 In *Yauch,* the trial court excluded evidence of the employer's program of rehabilitative services as well as an actual job offer. On appeal, the Court concluded that the existence of an available job opportunity was relevant to the issue of whether the plaintiff had mitigated his damages and should have been presented to the jury. In *Mikus,* the trial court excluded evidence of the employer's efforts to offer rehabilitative services and evidence of job offers it made to the plaintiff. On appeal, the Court similarly held that evidence of "rehabilitation services and alternative employment" should have been admitted. 244 Ill.Dec. 499, 726 N.E.2d at 110. The crucial difference between these cases and the case *sub judice* is that here, the trial court did permit Amtrak to introduce evidence of its offer to assist Callahan in obtaining employment, and merely excluded evidence which would have inaccurately suggested that Amtrak offered him a position as a power director and/or which

878

required expert opinion. Moreover, the record is clear that Callahan could not have taken a job as a power director while he remained on Percocet, which he was still taking at the time of trial, and there was no evidence that Callahan was actually capable of gainful employment. We cannot find that these rulings constitute an abuse of discretion. *See Wilson v. Union Pacific R.R. Co.*, 56 F.3d 1226, 1232 (10th Cir.1995) (explaining that evidence of the plaintiff's failure to mitigate damages in FELA case depends upon "the opportunity to seek appropriate work *when one is able to do so* " as well as the availability of appropriate jobs) (emphasis added).

■ ¶ 30 The third facet of Amtrak's second issue is related, as it claims that Callahan did not timely object to the evidence regarding the power director position. The record reflects that counsel for Callahan moved to limit Amtrak's evidence on this issue, including the testimony of Ms. DeSalvio, immediately after Callahan rested and prior to the defense beginning its side of the case. N.T. Trial, 1/22/07, at 25–26. The trial court entertained lengthy argument from counsel for both parties, including the timeliness of Callahan's objection, before issuing the ruling described above. *Id.* at 25–102. Based on our review of this record, it is clear that Callahan raised his objection to this evidence at the first opportunity during trial. Therefore, we are unable to perceive any abuse of the trial court's discretion in refusing to find Callahan's objection untimely.

■ ¶ 31 Lastly, Amtrak claims the trial court erroneously excluded evidence of Callahan's alleged substance abuse which was probative of his ability to work as a power director or in another capacity and, thus, was relevant to the claim of future lost earnings. Amtrak correctly observes that evidence of a plaintiff's chronic history of substance abuse, while prejudi-

cial, is probative of his or her life expectancy where permanent personal injury is alleged. *Pulliam v. Fannie*, 850 A.2d 636, 640–41 (Pa.Super.2004), *appeal denied*, 583 Pa. 696, 879 A.2d 783 (2005); *Kraus v. Taylor*, 710 A.2d 1142, 1144–45 (Pa.Super.1998).

¶ 32 The record reveals that, on the second day of trial, Amtrak sought via a motion *in limine* to introduce evidence of Callahan's alleged substance abuse. N.T. Trial, 1/17/07, at 3. Once again, the trial court entertained lengthy argument from counsel on this issue, at which time Amtrak set forth the basis for its motion. *Id.* at 3–26. In support thereof, Amtrak pointed to an indication that Callahan had used drugs once at the age of 16, some 20 years before trial, as well as the result of a random drug test in July 2003. *Id.* at 3–4. Amtrak argued that these instances evidenced a 20–year drug history. *Id.* at 5. The trial court determined that Amtrak failed to produce evidence that Callahan did, in fact, suffer from chronic substance abuse, and denied the motion. *Id.* at 24–26. Later during trial, Amtrak renewed its effort to delve into Callahan's use of prescription medications, and the trial court ruled that such would be permissible through a medical expert. N.T. Trial, 1/19/07, at 115–21. Amtrak chose not to do so.

¶ 33 We reiterate that a trial court's rulings on the admission of evidence are matters within its sound discretion. Despite Amtrak's efforts to characterize the evidence of two isolated instances of drug use, 20 years apart, as "chronic history," we must agree with the trial court that the record does not support this contention. Nor do we perceive an abuse of the trial court's discretion in requiring Amtrak to present its purported evidence of Callahan's dependence on prescription medications through a medical expert, since an

opinion that such constituted "substance abuse" necessarily required specialized knowledge beyond that of a lay juror.[11]

¶ 34 In conclusion, we find no merit to Amtrak's issues on appeal and, accordingly, affirm the judgment entered against it and in favor of Callahan.

¶ 35 Judgment affirmed.

**11.** Having discerned no error or abuse of discretion regarding the future economic loss claims, we find no need to address Amtrak's complaint that the trial court improperly de-

nied its request to include on the verdict slip separate lines for the different categories of claimed damages including future lost earnings.