2017 PA Super 354

| | |
|---|---|
| BETTY L. SHIFLETT AND CURTIS SHIFLETT, HUSBAND AND WIFE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| LEHIGH VALLEY HEALTH NETWORK, INC.; AND LEHIGH VALLEY HOSPITAL | |
| Appellants | No. 2293 EDA 2016 |

Appeal from the Judgment Entered July 18, 2016
In the Court of Common Pleas of Lehigh County
Civil Division at No(s): 2014-C-0388

BEFORE: SHOGAN, J., SOLANO, J., and PLATT, J.[*]

OPINION BY SOLANO, J.:                    **FILED NOVEMBER 09, 2017**

Appellants, Lehigh Valley Health Network, Inc., and Lehigh Valley Hospital (together, "Lehigh Valley"), appeal from the judgment entered following a jury trial and verdict in favor of Appellees Betty L. Shiflett and Curtis Shiflett. We conclude that the Shifletts' second amended complaint pleaded a new cause of action — for vicarious liability against Lehigh Valley for the negligent actions of Nurse Kristina Michels Mahler in Lehigh Valley's Transitional Skills Unit — that did not appear in the Shifletts' first amended complaint, and that this new cause of action was barred by the applicable statute of limitations. Accordingly, we vacate the judgment and reverse with respect to the verdict against Lehigh Valley for vicarious liability regarding Nurse Michels Mahler's actions. We reject Lehigh Valley's contentions of

---

[*] Retired Senior Judge assigned to the Superior Court.

error with respect to the verdict of corporate negligence related to the Shifletts' claim of improper care in Lehigh Valley's Post-Surgical Unit. We remand for a new trial on the question of damages.

On April 12, 2012, Ms. Shiflett underwent left knee surgery at Lehigh Valley Hospital. On April 14, 2012, Ms. Shiflett fell out of her hospital bed in Lehigh Valley's Post-Surgical Unit ("PSU") and suffered an avulsion fracture of her left tibial tubercle, which was not diagnosed until April 19, 2012. N.T., 2/5/16, at 31, 39.[1]

On April 15, 2012, Ms. Shiflett was transferred to Lehigh Valley's Transitional Skills Unit ("TSU"), where she received physical and occupational therapy. N.T., 2/3/16, Tr. of Cynthia Balkstra, at 61-64, 68-69; N.T., 2/5/16, at 39, 64, 66-69; Trial Ct. Op. at 2.[2] Ms. Shiflett claims that soon after her arrival at the TSU, she repeatedly reported "sharp pain" and a "clicking" in her knee to Kristina Michels Mahler, a nurse working in the TSU, but Nurse Michels Mahler did not notify a physician about those complaints. As a result, there was a delay in diagnosing Ms. Shiflett's avulsion fracture. After Ms. Shiflett's physical therapist reported

---

[1] During his testimony, the Shifletts' medical expert, Dr. Robert C. Erickson II, an orthopedic surgeon, explained: "if you feel your kneecap, there's a little ridge that goes down to the tibia and there's a tendon, and then where it touches is called the tibial tubercle." N.T., 2/5/16, at 39. He defined an avulsion fracture as one where the "tendon which was attached . . . pulled a piece of bone off." *Id.* at 40.

[2] The trial court opinion refers to the "TSU" as the "Transitional Skill**ed** Unit." Trial Ct. Op. at 2. However, all parties refer to it as the "Transitional Skill**s** Unit." *See* Second Am. Compl., 7/2/15, at ¶ 20; Lehigh Valley's Brief at 9; Shifletts' Brief at 3.

Ms. Shiflett's concerns on April 19, 2012, she had two additional surgeries to repair her avulsion fracture, but those surgeries were unsuccessful. Ms. Shiflett was left with no extensor mechanism in her leg and was no longer a candidate for further surgery due to past infection.[3]

On February 7, 2014, the Shifletts filed a complaint against Lehigh Valley ("Original Complaint") that made the following factual allegations:

10. On **April 12, 2012**, plaintiff Betty Shiflett underwent left knee revision surgery at Lehigh Hospital.

\* \* \*

12. In the early morning of **April 14, 2012**, as a direct and proximate result of the negligence of the defendants, including inadequate fall protection provided by defendants, an unattended **Betty Shiflett fell and suffered a left tibia avulsion fracture**.

13. A nursing note in the chart of Lehigh Hospital **dated April 14, 2012 at 4:45 A.M.** records that immediately after Betty Shiflett was found on the floor of her hospital room, a bed check was initiated and yellow socks were put on her feet.

14. The left tibia avulsion fracture suffered as a result of Betty Shiflett's fall would not have occurred in the absence of the negligence of the defendants including their failing to provide adequate and sufficient fall protection and monitoring.

15. On April 24, 2012, Dr. Ververeli performed open reduction surgery to repair Betty Shiflett's left tibia avulsion.

16. Post-surgical care of Betty Shiflett's left tibia reduction surgery was complicated by a staph infection. As a result, on May 22, 2012, Dr. Ververeli performed another surgery on her

---

[3] Dr. Erickson defined "no extensor mechanism" as meaning "your knee won't support you. So if you want to do something simple like stand up out of a chair; it can't stand up. Once you're up straight, the weight[-]bearing's fine. . . . The only thing you can go to [to keep the leg from buckling] is a brace." N.T., 2/5/16, at 68-69.

left knee, irrigating and debriding the left knee and inserting screws and antibiotic beads in an effort to treat the infection.

17. As a result of plaintiff Betty Shiflett's avulsion fracture and resulting tibial reduction surgery and infection, she continued to, and is likely to continue to stiffer pain, reduced range of motion, weakness and left knee instability and disability.

\* \* \*

20. The injuries and permanent disabilities suffered by plaintiff Betty Shiflett were the direct result of the defendants' negligence, by and through their agents, servants and/or employees and/or their ostensible agents following her April 12, 2012 left knee revision surgery at Lehigh Hospital which negligence includes:

a.) Failing to use due care or employ reasonable skill in the treatment administered to plaintiff Betty Shiflett.

b.) Employing inappropriate or inadequate methods, techniques and procedures in the care and treatment of plaintiff Betty Shiflett;

c.) Failing to timely and properly recognize that plaintiff Betty Shiflett was at significant risk for a post-operative fall;

d.) Failing to timely and properly prepare and/or otherwise have in place a patient care plan for plaintiff Betty Shiflett that would include appropriate monitoring and safeguards to reduce and/or eliminate her risk of post-operative fall;

e.) Failing to utilize and/or have in place reasonable and appropriate measures to prevent plaintiff Betty Shiflett from falling after her April 12, 2012 knee revision surgery, including but not limited to, full bed side rails, properly monitor the Plaintiff in her bed, a bed alarm and/or institute a bed check; provide non-skid socks;

f.) Failing to adopt and enforce adequate policies and procedures to plan for and to ensure the proper and safe use of reasonable fall protection methods;

g.)    Failing to select and retain competent physicians and staff;

h.)    Failing to properly oversee the professional staff working in Lehigh Hospital;

i.)    Failing to properly train and educate professional staff to identify fall risks and use appropriate methods to reduce the risk of a fall; and

j.)    Failing to adhere to the standard of medical care in the community.

*    *    *

23.    But for the negligence of the defendants described above, Plaintiff Betty Shiflett would have fully recovered from her knee revision surgery on April 12, 2012.

Original Compl., 2/7/14, at ¶¶ 10, 12-17, 20, 23 (emphases added).  Of significance here, these allegations all pertained to alleged negligence leading to Ms. Shiflett's fall from the bed in her hospital room; they did not allege subsequent negligence in the TSU.

Lehigh Valley filed preliminary objections.  Among other things, it argued that the allegations in Paragraph 20(a), (b), (d), (h), and (j) were too "general, vague and overbroad" to state a valid claim and to permit formulation of defenses.  Prelim. Objs. of Lehigh Valley, 3/11/14, at 9-11 ¶¶ 30-37; Br. in Supp. of the Prelim. Objs. of Lehigh Valley, 3/11/14, at 8-10.

In response, the Shifletts filed an amended complaint ("First Amended Complaint") on March 27, 2014.  This First Amended Complaint repeated the

allegations in Paragraphs 10, 12-17, and 23 from the Original Complaint[4]

and added the following new paragraphs:

> 23. In addition to the allegations of negligence described in paragraphs 1 through 21 above, the injuries and permanent disabilities suffered by plaintiff Betty Shiflett were the direct result of the defendants' negligence, by and through their agents, servants and/or employees and/or their ostensible agents following her April 12, 2012 left knee revision surgery at Lehigh Hospital which negligence includes: [eight subparagraphs that are identical to subparagraphs 20(a)-(d), (g)-(h), and (j) in the Original Complaint].

> \* \* \*

> 31. In addition to the allegations of negligence described in paragraphs 1 through 29 above, the injuries and permanent disabilities suffered by plaintiff Betty Shiflett were the direct result of the defendants' negligence following her April 12, 2012 left knee revision surgery at Lehigh Hospital which negligence includes:

> > a.) Failing to timely and properly prepare and/or otherwise have in place patient care plans that would include appropriate monitoring and safeguards to reduce and/or eliminate risk of post-operative fall;

> > b.) Failing to utilize and/or have in place reasonable and appropriate fall protection measures, including but not limited to, full bed side rails, proper bed monitoring, a bed alarm and/or institute a bed check, provide non-skid socks;

> > c.) Failing to adopt and enforce adequate policies and procedures to plan for and to ensure the proper and safe use of reasonable fall protection methods;

> > d.) Failing to select and retain competent physicians and staff;

---

[4] The First Amended Complaint renumbered some of the paragraphs contained in the Original Complaint without altering their substance. Specifically, Paragraph 23 of the Original Complaint became Paragraph 21.

> e.) Failing to properly oversee the professional staff working in Lehigh Hospital;
>
> f.) Failing to properly train and, educate professional staff to identify fall risks and use appropriate methods to reduce the risk of a fall; and
>
> g.). Failing to adhere to the standard of medical care in the community.

First Amended Compl., 3/27/14, at ¶¶ 23, 31. The amendment added no paragraphs referencing Ms. Shiflett's care in the TSU.

Once again, Lehigh Valley filed preliminary objections that argued, among other things, that the negligence allegations were too vague and general to state a claim and permit framing of defenses. Prelim. Objs. of Lehigh Valley, 4/10/14, at 7-9 ¶¶ 24-31. It also argued that, if not stricken, the broad averments of negligence might improperly be used to permit some "future, unexpected amendment to the complaint based upon new facts after the statute of limitations has run." *Id.* at 9 ¶ 30 (citation omitted); Br. in Supp. of the Prelim. Objs. of Lehigh Valley, 4/10/14, at 8.

This time, the Shifletts responded by detailing why their allegations were sufficient:

> Here, the Amended Complaint, read as a whole and in context, contains detailed and specific allegations that are more than sufficient to allow Lehigh [Valley] to defend against claims of vicarious and corporate liability. The Amended Complaint alleges that on "April 12, 2012 plaintiff underwent left knee revision surgery at Lehigh [Valley] Hospital." [First Amended Compl., 3/27/14,] at ¶ 10. During surgery she was given a femoral nerve block and general anesthesia. *Id.* After surgery, "[d]espite having high risk factors for falling, including her age, being in an unfamiliar location, use of a nerve block and left knee instability, the physicians, nurses, officers, directors,

- 7 -

and/or other **employees or agents of the defendants that were responsible for [Ms.] Shiflett's post-surgical care did not provide her with adequate fall protection**, including, among other things, full bed side rails, bed alarm and/or bed checks, non-skid footwear, and monitoring." *Id.* at ¶ 11. Foreseeably, **"[i]n the early morning of April 14, 2012, as a direct and proximate result of the negligence of the defendants, including inadequate fall protection provided by the defendants, an unattended [Ms.] Shiflett fell** and suffered a left tibia avulsion fracture." *Id.* at ¶ 12. [Ms.] Shiflett's avulsion fracture required additional surgery that was complicated by an infection. *Id.* at ¶¶ 15-16. As a result of her fracture and related infection, she "has been advised that there are no treatment options that would improve the condition of her left knee[,] leaving her permanently injured, disabled and damaged." *Id.* at ¶ 17.

**These averments provide the factual backdrop and context for the allegations of negligence contained in paragraph 23 of the Amended Complaint. In conjunction with these allegations, paragraph 23 specifically details the legal theories of vicarious liability against the defendants.** As alleged in paragraph 23, defendants are liable for, among other things, "failing to use due care," "[e]mploying inappropriate or inadequate fall protection methods," "[f]ailing to timely and properly prepare and/or have in place reasonable and appropriate measures to prevent plaintiff . . . from falling" and "failing to adhere to the standard of medical care in the community." [First Amended Compl., 3/27/14,] at ¶ 23. Thus, read as a whole and in context, the Amended Complaint sufficiently put the defendants on notice as to the vicarious liability claims against them and allow them to put on a defense.

Shifletts' Resp. to Lehigh Valley's Prelim. Objs. to Shifletts' First Am. Compl., 5/1/14, at 9-10 ¶ 26 (emphasis added). The Shifletts' explanation made no reference to any claim regarding care in the TSU and instead focused only on the defendants' failure to prevent her fall in the PSU. On July 1, 2014, the trial court overruled Lehigh Valley's preliminary objections.

The case proceeded to discovery, and a trial date was set. On May 14, 2015 (more than three years after the events in the hospital that give rise to this case), the Shifletts filed a motion for leave of court to amend their complaint yet again. This time, they stated that they sought to conform their first amended complaint "to the evidence uncovered during discovery." Shifletts' Mot. for Leave of Ct. to Amend Compl. to Conform the Pleading to the Evid., 5/14/15, at 2. Their motion thus sought "leave to file a Second Amended Complaint identifying specific nurses responsible for [Ms.] Shiflett's post-surgical care by name and to include more specific facts supporting [the Shifletts'] claims." *Id.* at 4 ¶ 7. Specifically, the Shifletts proposed to include the following new paragraphs in their pleading:

> 14. One of [Lehigh Valley's] employees, **Terry Langham**, has been identified as responsible for implementing fall precautions **the evening of April 13, 2012 and the early morning of April 14, 2012**. Nurse Langham documented Betty Shiflett as a high fall risk but failed to implement appropriate fall prevention interventions, including a bed alarm and/or bed check, proper footwear, fall risk identification methods and monitoring, thus increasing the risk that Betty Shiflett would suffer a fall.
>
> \* \* \*
>
> 20. On or about **April 15, 2012**, Betty Shiflett was transferred to Lehigh Valley Hospital's Transitional Skills Unit ("TSU"). Transfer documents prepared by the defendants make no mention of Betty Shiflett having fallen while inpatient at Lehigh Hospital.
>
> \* \* \*

- 9 -

22.   As a result of **Nurse Michels [Mahler's**[5]**]** failure to communicate Betty Shiflett's complaints, Betty Shiflett received multiple rounds of physical and occupational therapy between **April 15 and April 19, 2012**, increasing the risk of additional injury to her already compromised knee and, as a result, the need for subsequent surgical intervention.

23.   On or about **April 19, 2012**, during a physical therapy session, a physical therapy assistant in the TSU heard the same "clicking noise" in Betty Shiflett's left knee that Betty Shiflett had previously reported to Nurse Michels [Mahler].   The physical therapy assistant notified the nursing staff and an x-ray was ordered.

\*     \*     \*

33.   In addition to the allegations of negligence described in paragraphs 1 through 31 above, the injuries and permanent disabilities suffered by plaintiff Betty Shiflett were the direct result of the defendants' negligence, by and through their agents, servants and/or employees and/or their ostensible agents, including Nurses Terry Langham and Kristina Michels [Mahler], following Betty Shiflett's April 12, 2012 left knee revision surgery at Lehigh Hospital, which negligence includes:

a.)   Failing to use due care or employ reasonable skill in the treatment administered to plaintiff Betty Shiflett;

b.)   Employing inappropriate or inadequate fall protection methods, techniques and procedures in the care and treatment of plaintiff Betty Shiflett;

c.)   Failing to timely and properly recognize that plaintiff Betty Shiflett was at significant risk for a post-operative fall;

d.)   Failing to timely and properly prepare and/or otherwise have in place a patient care plan for plaintiff Betty Shiflett that would include appropriate monitoring

_____

[5] According to the trial court opinion, "Nurse Michels Mahler's name was changed from Michels to Michels Mahler sometime between the date of Ms. Shiflett's hospital stay and trial." Trial Ct. Op. at 7 n.4.  According to Lehigh Valley's counsel, she changed her last name after marriage.  N.T., 2/9/16, at 6.

- 10 -

and safeguards to reduce and/or eliminate her risk of post-operative fall;

e.)    Failing to utilize and/or have in place reasonable and appropriate measures to prevent plaintiff Betty Shiflett from falling after her April 12, 2012 knee revision surgery, including but not limited to, full bed side rails, proper monitoring of Plaintiff in her bed, increased rounding, use of a bed alarm and/or bed check; use of appropriate non-skid socks; notification to Curtis Shiflett that his wife was a high fall risk; and notification to Curtis Shiflett that he could spend the night at his wife's bedside to reduce the risk of a fall;

**f.)    Nurse Michels[ Mahler's] failure to timely notify Betty Shiflett's physicians and physical therapists about Betty Shiflett's post-surgical complaints of increased left knee weakness and buckling, increasing sharp pain in her left knee and a clicking noise in her knee;**

g.)    Failing to select and retain competent physicians and staff;

h.)    Failing to properly oversee the professional staff working in Lehigh Hospital; and

i).  Failing to adhere to the standard of medical care in the community.

\*    \*    \*

41.    In addition to the allegations of negligence described in paragraphs 1 through 39 above, the injuries and permanent disabilities suffered by plaintiff Betty Shiflett were the direct result of the defendants' negligence following her April 12, 2012 left knee revision surgery at Lehigh Hospital which negligence includes:

\*    \*    \*

g.)    **Failing to properly train and educate professional staff to identify and report worsening physical symptoms and complaints**

- 11 -

[Proposed] Second Am. Compl., 7/2/15, at ¶¶ 14, 20, 22-23, 33, 41(g) (emphases added). Thus, for the first time, the proposed second amended complaint sought to add allegations of negligence regarding Ms. Shiflett's care in the TSU in the days following her fall.

Lehigh Valley opposed the motion for leave to amend. In its opposition, Lehigh Valley argued:

> The entire gist of the [First Amended] Complaint concerns fall prevention strategies. However, [the Shifletts] now seek to amend the Complaint to assert claims for care provided between August 14, 2012 and August 19, 2012. . . . [W]hat was a "fall prevention" case, is now a case with regard to nursing malpractice relative to the signs and symptoms of a displaced fracture.

Br. in Supp. of Answer to Pls.' Mot. for Leave of Ct. to Amend Compl. to Conform the Pleading to the Evid., 6/11/15, at 1-3. Lehigh Valley contended that the proposed amendment would "add a complete new cause of action" that was barred by the statute of limitations because it concerned events that occurred in April 2012, more than two years before the proposed amendment. Suppl. Br. in Supp. of Answer to Lehigh Valley's Mot. for Leave of Ct. to Amend Compl. to Conform the Pleading to the Evid., 6/12/15, at 1.

On June 12, 2015, the trial court granted the Shifletts' motion for leave to file the second amended complaint, and the Shifletts filed that pleading on July 2, 2015 ("Second Amended Complaint"). As filed, the Second Amended Complaint was identical to the proposed pleading that had been attached to the Shifletts' motion for leave to amend. Lehigh Valley

filed a motion for reconsideration, which the trial court denied on July 10, 2015.

Meanwhile, the parties continued to prepare for trial. On July 6, 2015, Dr. Robert C. Erickson II, the Shifletts' medical liability expert and an orthopedic surgeon, submitted an expert report in which he opined that Ms. Shiflett's fall resulted in the trauma to her knee.

One of the contested issues in the case concerned Ms. Shiflett's claim for damages from depression that she contended was the result of her hospital injuries. Lehigh Valley contended that the depression was caused by her son's arrest for a sexual offense involving a close family member. On January 20, 2016, the parties recorded a deposition of Robert W. Mauthe, M.D., a physician specializing in physiatry and rehabilitation who was identified as an expert witness for the defense. Mauthe Dep. at 5-6. Dr. Mauthe stated that in his examination of Ms. Shiflett she had stated that both her knee injury and her son's issues contributed to her depression. *Id.* at 41.

Trial commenced on February 1, 2016. During pretrial proceedings, the Shifletts moved *in limine* to preclude Lehigh Valley from introducing evidence that Ms. Shiflett's adult son had been convicted of corruption of a minor. N.T., 2/2/16, at 4. The trial court precluded Lehigh Valley from presenting the details of Ms. Shiflett's son's criminal history and "the nature of the son's offense" but allowed it to inquire generally about the son's "legal

problems" as a proposed alternative explanation for Ms. Shiflett's depression. *Id.* at 10-11.

At trial, Nurse Cynthia Balkstra testified for the Shifletts that Lehigh Valley had inappropriate fall prevention guidelines in place. When asked about the appropriate use of the guidelines, Nurse Balkstra explained:

> [A.] The purpose of the guidelines, again, is to make sure that you use them. So the more regular — the more regular use of them, the more discussion about them, the more promotion of them the better because staff — I mean, it's easy — there's lots of things to remember as a nurse, and it's easy for a staff person to forget exactly what is in the guidelines. So the more emphasis, the more reeducation to the guidelines the better.
>
> Q. Is reviewing the guidelines during orientation and not looking at them again, is that an appropriate use of the guidelines in your opinion as a nurse?
>
> A. No.

N.T., 2/3/16, Tr. of Cynthia Balkstra, at 45-46.

Nurse Balkstra further testified that, based upon her review of the records, Nurse Langham had scored Ms. Shiflett as a "six" on her fall risk assessment, indicating a "high risk for falling." N.T., 2/3/16, Tr. of Cynthia Balkstra, at 49-50. Nurse Balkstra continued:

> [A.] My opinion is that the staff were not educated frequently enough on the use of the guidelines, and specifically the use of the guidelines per the risk.
>
> So in other words, the high risk measures, strategies to prevent a fall were not utilized with Ms. Shiflett. And it — from what Ms. Langham's deposition stated, that she really didn't treat[] a six any different than she would have treated a two.

So that's a failure to educate, properly on the use of the guidelines, which you spend a lot of effort putting together. So you definitely want to use them appropriately.

Q.    Did you reach a conclusion as to whether or not Lehigh Valley['s] failure to appropriately train its nursing staff how to use fall precautions guidelines increased the risk of [Ms.] Shiflett falling?

A.    Yes, in this case it did because with a score of six, more of those high risk measures should have been put into place.

*Id.* at 69-70.

Ms. Shiflett testified that she "feel[s] that there's nothing more to live for" and that her knee is "very embarrassing." N.T., 2/4/16, at 106, 109. She added that her husband has to shower her, and she can only dress herself "from the waist up," since she "cannot bend down." *Id.* at 106. She continued that she has pain "[a]ll the time," including in her back. *Id.* at 107. She further testified that, while she can ride as a passenger in an automobile, she cannot "go far," because travelling causes her too much pain. *Id.* She also mentioned that she was wearing a brace while she was testifying. *Id.* at 109. She concluded her direct examination by noting that she and her husband have contacted other doctors in New Jersey, New York, and Philadelphia, and all of them agreed that her knee could not be repaired, since she needed a new tendon and a new kneecap.

On February 5, 2016, Dr. Erickson testified that he reviewed Lehigh Valley's medical records regarding Ms. Shiflett, which also included her physical therapy evaluations from before and after the fall. N.T., 2/5/16, at 34-35, 42. Based on that review, he opined that Ms. Shiflett's fall out of bed

caused her to sustain a non-displaced fracture. On the day after her surgery, Ms. Shiflett's leg had a range of 6º to 85º, which Dr. Erickson explained was "great" for the "[f]irst day post-op." *Id.* at 34-35.[6] On the day after her fall, April 15, 2012, Ms. Shiflett was in excruciating pain and her range of leg motion had decreased to 20º to 65º. *Id.* The nursing notes from the TSU recorded various symptoms of distress, including continuing pain, buckling of her knee, and a need for maximum assistance from staff. *Id.* at 48-49, 52-62. On April 19, after receiving physical and occupational therapy between April 16 and 19 in the TSU, Ms. Shiflett was diagnosed with the avulsion fracture. Dr. Erickson said this meant that the physical therapy that Ms. Shiflett had been receiving in the TSU was "not appropriate," because "[t]he tendon keeps pulling and ultimately the quad muscle gets strong enough that it pulls the large tendon, bone comes loose, and this retinaculum tears." *Id.* at 29-40, 47-48. In Dr. Erickson's opinion, Ms. Shiflett's knee became displaced around April 19 due to the stress put on it by the physical therapy in the TSU between April 16 and 19. *Id.* at 63-64.

Also on February 5, 2016, the Shifletts' life care planner expert, Nurse Nadene Taniguchi, testified about Ms. Shiflett's damages, and, specifically, her future medical costs. N.T., 2/5/16, at 124-56.

---

[6] Dr. Erickson explained that when a leg is straight, it is considered at 0º; when it bends to a normal sitting position, it is at 90º, a right angle; when bent all the way back, it is considered at 120º. N.T., 2/5/16, at 34-35, 42.

At the close of the Shifletts' case-in-chief later that day, Lehigh Valley moved for a non-suit and/or directed verdict with respect to the claims relating to Ms. Shiflett's treatment at the TSU because those claims related to a new cause of action that had not been pleaded within the period allowed by the statute of limitations. N.T., 2/5/16, at 193.  The trial court denied that motion.

When court resumed on Monday, February 8, 2016, counsel and the trial court had the following colloquy:

> THE COURT:  Okay.  Counsel, just so I understand – this will be on the record.  The corporate negligence claim is only with regard to the TSU.
>
> [LEHIGH VALLEY'S COUNSEL:]     No.  It's with regard to the hospital. . . . My understanding is the corporate negligence was with regard to Terri Langham's training on the fall prevention strategy.
>
> [SHIFLETTS' COUNSEL]:     Yes.  That's true, Your Honor.  It's not –
>
> THE COURT:     That's where the corporate negligence is?
>
> [SHIFLETTS' COUNSEL]:     That's right.
>
> THE COURT:     Is the fall?
>
> [SHIFLETTS' COUNSEL]:     The fall itself, right.
>
> THE COURT: . . . And where is the vicarious liability? . . .
>
> [SHIFLETTS' COUNSEL]: . . . The vicarious liability would be for Nurse Langham as well in failing to use appropriate procedures for the fall is one part of the vicarious liability. . . .
>
> THE COURT: . . . So vicarious liability is in both instances and the corporate negligence?

[SHIFLETTS' COUNSEL]: Just for the fall.

THE COURT: Is just for the fall. Is there vicarious liability in the fall also?

[SHIFLETTS' COUNSEL]: Yes. . . .

THE COURT: . . . [W]e're going to have to instruct the jury both on corporate and vicarious.

N.T., 2/8/16, at 4-6. The parties thus agreed that the Shifletts' vicarious liability claims related to both the fall in the PSU and the alleged diagnosis failure in the TSU, but that the Shifletts made no claim (and thus sought no jury instruction) for corporate liability against Lehigh Valley with respect to the events that occurred in the TSU. *See id.*

At the end of the court session on February 8, 2016, the trial court presented counsel with a draft verdict sheet, *see* N.T., 2/8/16, at 115, which (with instructions omitted) stated the following:

1. Do you find that Nurse Langham of the Lehigh Valley Hospital (Post Surgical Unit) was negligent?

2. Was the negligence of Nurse Langham of the Lehigh Valley Hospital (Post Surgical Unit) a factual cause of harm to Plaintiff Betty L. Shiflett?

3. Do you find that Nurse Michels Mahler of the Lehigh Valley Hospital (Transactional Skilled Unit) was negligent?

4. Was the negligence of Nurse Michels Mahler of the Lehigh Valley Hospital (Transitional Skilled Unit) a factual cause of harm to Plaintiff, Betty L. Shiflett?

5. Do you find that Lehigh Valley Hospital itself was negligent?

6. Was the negligence of Lehigh Valley Hospital a factual cause of harm to Plaintiff, Betty L. Shiflett?

After each question, the jury could answer "Yes" or "No." The remainder of the verdict sheet allowed for the calculation of damages but not for an itemization of damages by claim. The next day, the parties agreed to this verdict sheet. N.T., 2/9/16, at 4.

Prior to closing arguments, the court confirmed with the parties that it would instruct the jury on corporate negligence for failure to train and supervise:

> [THE COURT: T]ell me which of those options under corporate negligence, because there are like four different examples under the corporate negligence instruction.
>
> [SHIFLETTS' COUNSEL]: I think it was the failure to train, Your Honor.
>
> THE COURT: What about supervise?
>
> [SHIFLETTS' COUNSEL]: And supervise – I think that's right. . . . I think it's going to be failure to supervise, Your Honor. And I think it's also going to be failure to properly train employees.
>
> THE COURT: Train and supervise.

N.T., 2/9/16, at 9-10.

During his closing argument, the Shifletts' counsel provided his understanding of the verdict sheet to the jury:

> [T]he fifth question is about Lehigh Valley Hospital itself. So the first question is about Terri Langham. The next question's about Nurse Michels [Mahler], but the fifth question is was the Hospital negligent? . . . [H]ow can it be that we have these policies and procedures in place for the sole purpose of preventing falls that are 75 percent accurate in predicting who's going to fall, how can it be that we only have our nurses look at them once during orientation and never have them do it again. I submit to you

- 19 -

that's negligent and that was just as big a cause as anything else.

N.T., 2/9/16, at 44-45. During her closing argument, Lehigh Valley's counsel also provided her interpretation of liability allegations against her clients as reflected on the verdict sheet:

It is the plaintiff that must prove to you that Lehigh Valley Hospital committed either what we call corporate negligence or its nurses committed professional negligence. . . . They also have a claim for corporate negligence, which means Lehigh Valley Hospital didn't train and supervise its nurses with regard to a fall prevention policy.

N.T., 2/9/16, at 52-53.

The trial court then instructed the jury as follows:

The issues, basically, in the framework, there are three different kinds of negligence which we need you to look at. One is Nurse Langham's alleged negligence; one is Nurse Michels Mahler's alleged negligence; and the other, which is a whole separate issue, is the corporate negligence of Lehigh Valley Hospital Network. . . . I just want you to know that because Nurse Langham and Nurse Michels Mahler were employees of Lehigh Valley Hospital, that if you find either or both of them negligent, that, in fact, a verdict would be against Lehigh Valley Hospital and not against them personally. . . .

The next thing I'm going to do is describe to you the standard that is going to be applied to Question Number 5 which is: Do you find that Lehigh Valley Hospital itself was negligent? . . . Because that is a different type of negligence than the one I've been describing to you with regard to the nurses. . . . [T]his theory is called corporate liability of a health care provider. And it goes as follows, and this is the standard you are to apply to Question Number 5. A health care institution, in this case a hospital, is directly liable to the patient if it violates a duty that it owes to the patient to ensure the patient's safety and well-being while under the care of the hospital. The following are the duties that a hospital must fulfill and that it cannot pass on to anyone else. A duty to oversee all persons who practice, including nursing care, within its walls as to patient care, and a duty to

adopt, formulate, and enforce adequate rules and policies to ensure quality care for the patients. If you decide that the hospital as an institution violated those duties, then you must decide whether the Hospital knew or should have known of the breach of that duty and that the conduct was a factual cause in bringing about the harm or injury.

N.T., 2/9/16, at 109, 113-14 (emphasis added). Although the trial court did not explicitly instruct whether the corporate negligence claim was with respect to the events that occurred in the PSU and/or the TSU, neither counsel nor the court suggested that the corporate negligence claim related to events in the TSU. Significantly, at trial and in its brief to this Court Lehigh Valley did not challenge this jury instruction as defective for failing to specify the time period or location of the corporate negligence claim. **See generally** N.T., 2/9/16; Lehigh Valley's Brief.

The jury returned its verdict later on February 9, 2016. Following the verdict sheet, the jury found that (1) Nurse Langham (the nurse who was alleged not to have employed proper fall-protection procedures in the PSU) was not negligent (Question 1); (2) Nurse Michels Mahler (the nurse who was alleged not to have reported Ms. Shiflett's post-operative complaints in the TSU) was negligent (Question 3), and her negligence was "a factual cause of harm" to Ms. Shiflett (Question 4); and (3) "Lehigh Valley Hospital itself was negligent" (Question 5), and "the negligence of Lehigh Valley Hospital" was "a factual cause of harm" to Ms. Shiflett (Question 6). Verdict Sheet, 2/9/16, at 1-2 ¶¶ 1, 3-6; **see also** Trial Ct. Op. at 2-3. The jury awarded the Shifletts $2,391,620 in damages; consistent with the verdict

sheet, there was no breakdown of the verdict by claim. ***See*** Verdict Sheet, 2/9/16, at 3 ¶ 7. After the verdict was read into the record, the trial court asked counsel, "Is there any business with the jury before we excuse them?" N.T., 2/9/16, at 130. Lehigh Valley's counsel asked for the jury to be polled but did not object to the verdict. ***Id.***

On February 18, 2016, Lehigh Valley filed post-trial motions, including a motion for judgment notwithstanding the verdict and a motion for a new trial. Mots. of Lehigh Valley for Post-trial Relief & a New Trial, 2/18/16, at 4-15 ¶¶ 21-75. Again, with respect to the vicarious liability claim regarding Nurse Michels Mahler, Lehigh Valley maintained that "[w]hat was a 'fall prevention' case became, by virtue of the Second Amended Complaint, a case of nursing malpractice relative to the signs and symptoms of a displaced fracture involving a different facility and a different time frame." Br. of Lehigh Valley in Supp. of Post-trial Mots., 4/29/16, at 8; ***see also*** Reply Br. of Lehigh Valley in Supp. of Post-trial Mots., 5/26/16, at 3. Lehigh Valley's post-trial motions were denied by the trial court on June 30, 2016. On July 18, 2016, judgment was entered against Lehigh Valley.

Lehigh Valley appealed on July 29, 2016, and raises the following issues for our review:

> A.    Whether the trial court erred in permitting the Shifletts to amend their Complaint a year after the statute of limitations expired and then not granting a non-suit and/or a directed verdict on the Shifletts' negligence allegations related to the treatment in the [TSU] by Nurse [Michels] Mahler since such allegations were barred by the statute of limitations and there

was no expert testimony relative to causation for any alleged harm in the TSU?

B. Whether the trial court erred in permitting the Shifletts to amend their Complaint a year after the statute of limitations expired and then not granting a non-suit and/or a directed verdict on the Shifletts' corporate negligence claim when such claim, to the extent it was related to the actions of Nurse [Michels] Mahler, was time-barred [by] the statute of limitations?

C. Whether the trial court erred in precluding evidence of the criminal history of [Ms.] Shiflett's son since such evidence directly affected the level of damages she attributed to [Lehigh Valley's] alleged acts of negligence and such evidence was directly relevant to her credibility?

D. Whether the trial court erred in permitting the Shifletts' life care planner expert to testify on future medical expenses which were not reduced to present value?

E. Whether the trial court erred in allowing the Shifletts' liability expert, Dr. Erickson, to testify beyond the scope of his report?

F. Whether the trial court erred in denying remittitur where the jury's award for future medical expenses was not supported by the evidence and the award substantially deviated from what can be considered reasonable compensation?

G. Whether the trial court erred in not granting judgment notwithstanding the verdict when the jury's verdict finding that Nurse Langham was not negligent was inconsistent with its verdict finding [Lehigh Valley] liable for corporate negligence?

Lehigh Valley's Brief at 6-7.

### Statute of Limitations Regarding TSU Claims

Lehigh Valley contends that it was entitled to judgment as a matter of law because the TSU claims added by the Second Amended Complaint were barred by the statute of limitations.

Our standards of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

There are two bases upon which a judgment [notwithstanding the verdict] can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

**Reott v. Asia Trend, Inc.**, 7 A.3d 830, 835 (Pa. Super. 2010) (citations and internal brackets omitted), **aff'd**, 55 A.3d 1088 (Pa. 2012).

Lehigh Valley contends that, because the Second Amended Complaint's new negligence allegations related to Ms. Shiflett's treatment at the TSU from April 15 to April 19, 2012, the TSU claim was barred by the two-year statute of limitations applicable to tortious injuries. **See** 42 Pa.C.S. § 5524(2). According to Lehigh Valley, "the statute of limitations had expired on these new claims on April 19, 2014, more than [a] year before the Shifletts sought leave to amend [in May 2015]. . . . Accordingly, a new trial is needed to remedy this injustice." **Id.** at 16, 21; **see also id.** at 50.

Lehigh Valley emphasizes that the events in the TSU involving Nurse Michels Mahler occurred during a different (later) time period from the allegedly negligent conduct that had been alleged in the Shifletts' prior

- 24 -

pleadings, happened at a different location (the TSU, rather than her hospital room), and were caused by different people (Nurse Michels Mahler and the TSU staff, rather than the hospital staff). According to Lehigh Valley, the claims of negligence in the Ms. Shiflett's hospital room relate to the failure to take measures to prevent her from falling from her bed; the claims of negligence in the TSU relate to a failure to inform TSU personnel of Ms. Shiflett's symptoms following her fall, which caused deferral of the diagnosis of her injuries and allowed aggravation of those injuries during therapy. *See* N.T., 2/3/16, Tr. of Cynthia Balkstra, at 61-64, 68-69; N.T., 2/5/16, at 31, 39, 64, 66-69; Trial Ct. Op. at 2. Lehigh Valley claims that the TSU events therefore constitute a separate cause of action from the events that gave rise to Ms. Shiflett's fall in her hospital room.

The Shifletts answer that their second amended complaint "did not plead a new cause of action for vicarious liability after the statute of limitations had run. Rather, it merely amplified the theory of vicarious liability pled in the First Amended Complaint." Shifletts' Brief at 31 (citations to the record omitted).

The trial court agreed with the Shifletts, writing:

Here, the amendment did not change the causes of action asserted against [Lehigh Valley], but merely amplified what had already been asserted in the Amended Complaint. . . . The language of the Amended Complaint is broad enough to encompass the specific allegations in the Second Amended Complaint. The Amended Complaint generally asserted that [Lehigh Valley] undertook and/or assumed a duty to plaintiffs to use reasonable, proper, adequate and appropriate medical care, services and treatment and to take appropriate measures to

avoid harm to Plaintiff Betty Shiflett. Plaintiffs' Amended Complaint, ¶ 19. Further, it asserted that [Lehigh Valley] was negligent, by and through their agents, servants and/or employees and/or their ostensible agents following Ms. Shiflett's April 12, 2012, left knee revision surgery at [Lehigh Valley] for: "failing to use due care or employ reasonable skill in the treatment administered to Plaintiff Betty Shiflett; failing to select and retain competent physicians and staff; failing to properly oversee the professional staff working in Lehigh Valley Hospital; and failing to adhere to the standard of medical care in the community." *Id.* at if 23(a), (f), (g), (h). Plaintiffs' assertion in the Second Amended Complaint was a specific example of the asserted negligence against [Lehigh Valley]: one of [Lehigh Valley]'s employees, Nurse Michels Mahler, following Ms. Shiflett's April 12, 2012, surgery, failed to use due care or employ reasonable skill in the treatment administered to Ms. Shiflett when Nurse Michels Mahler failed to communicate Ms. Shiflett's complaints about her sharp knee pain, clicking, instability, and buckling to a doctor or physical therapist causing an increased risk of harm to the compromised knee.

The specific allegation against Nurse Michels Mahler amplified the timely-filed vicarious liability cause of action against [Lehigh Valley]. Accordingly, the Second Amended Complaint was properly permitted, the allegations of negligence against [Lehigh Valley] regarding Ms. Shiflett's time in the TSU were not time-barred, and [Lehigh Valley's] motion for directed verdict on that basis was properly denied.

Trial Ct. Op. at 8-9 (internal brackets and footnote omitted).

The determinative question is whether the part of the Shifletts' Second Amended Complaint that sought recovery for post-operative events that occurred in the TSU on April 15-19, 2012, stated a new cause of action that had not been pleaded within two years of those dates — that is, by April 19, 2014. If so, then that portion of the Second Amended Complaint, which was not filed until July 2, 2015, was time-barred. After reviewing the record, we conclude that the trial court erred because the TSU claim was not mentioned

in the Shifletts' pleadings prior to the Second Amended Complaint and, most importantly, when called upon to explain those earlier pleadings, the Shifletts' represented to both the trial court and Lehigh Valley that their allegations related only to negligence leading to Ms. Shiflett's fall in the PSU.

The law governing deadlines for filing negligence claims is well-settled:

> In Pennsylvania, a cause of action for negligence is controlled by the two-year statute of limitations set forth in 42 Pa.C.S[.] § 5524(2). The statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations. It is the duty of the party asserting a cause of action to use all reasonable diligence to properly inform himself of the facts and circumstances upon which the right of recovery is based and to institute suit within the prescribed period.

*Cappelli v. York Operating Co.*, 711 A.2d 481, 484–85 (Pa. Super. 1998) (*en banc*) (brackets, citations, and internal quotation marks omitted).

Under our rules of procedure, leave to amend a complaint is to be liberally granted. *Hill v. Ofalt*, 85 A.3d 540, 557 (Pa. Super. 2014). Nevertheless, "[i]t is axiomatic that a party may not plead a new cause of action in an amended complaint when the new cause of action is barred by the applicable statute of limitations at the time the amended complaint is filed." *N.Y. State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 928 (Pa. Super. 1989) (*en banc*); *see also Echeverria v. Holley*, 142 A.3d 29, 37 (Pa. Super. 2016) ("amendment introducing a new cause of action will not be permitted after the statute of limitations has run in favor of a defendant" (brackets and citation omitted)), *appeal denied*,

169 A.3d 17 & 169 A.3d 18 (Pa. 2017); *Junk v. East End Fire Dep't*, 396 A.2d 1269, 1277-78 (Pa. Super. 1978). "[T]he test is whether an attempt is made to state facts which give rise to a wholly distinct and different legal obligation against the defendant." *Hodgen v. Summers*, 555 A.2d 214, 215 (Pa. Super.) (citation omitted), *appeal denied*, 563 A.2d 888 (Pa. 1989). The question is whether the operative facts supporting the claim were changed, not whether the amendment presented a new category of claim or theory of recovery. *See id.*[7]

Two cases, with facts and procedural histories similar to those of the current action, are instructive in resolving this issue. *Chaney v. Meadville Med. Ctr.*, 912 A.2d 300 (Pa. Super. 2006), was a malpractice action arising from the death of an 18-year-old woman, Jessica Kimple. On March 13, 2000, Kimple reported to Meadville Medical Center's emergency room with a cough and a high temperature. She was examined by a Dr. Bollard, who without ordering x-rays or laboratory tests, diagnosed viral bronchitis and discharged Kimple with instructions to use an inhaler and to take over-the-counter cough medicine. Two days later, on March 15, Kimple returned to

---

[7] "Fall prevention" and nursing malpractice claims are both types of medical malpractice claims. *See Freed v. Geisinger Med. Ctr.*, 971 A.2d 1202, 1206 (Pa. 2009) (nursing malpractice is medical malpractice); *Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 319, 322 (Pa. Super. 2007) (fall from hospital bed raised a claim of professional negligence/malpractice, not of ordinary negligence), *aff'd*, 17 A.3d 310 (Pa. 2011). To establish a cause of action for medical malpractice, a plaintiff must demonstrate: (1) a duty owed by the medical professional to the patient; (2) a breach of that duty by the professional; (3) that the breach was the proximate cause of the harm suffered; and (4) that the damages suffered were a direct result of the harm. *Freed*, 971 A.2d at 1206.

the emergency room with much more serious symptoms. An x-ray revealed signs of pneumonia and severe hypoxia (oxygen deficiency). Kimple was hospitalized and placed on a ventilator, and she died soon thereafter. On June 12, 2002, her estate brought a malpractice action against Dr. Bollard and Meadville that, in an amended complaint, alleged lack of proper care during Dr. Bollard's March 13, 2000 examination and diagnosis of Kimple.

On September 14, 2005, Kimple's estate sought leave to amend its complaint to add allegations that Dr. Bollard treated Kimple on March 17, 2000, after she was admitted to the hospital, and that his treatment of her at that time was negligent. The trial court denied the motion on the ground that it sought to allege new claims against Dr. Bollard that had not previously been pleaded, and on appeal, this Court agreed, stating:

> [A] fair reading of the amended complaint does **not** include an averment of malpractice against Dr. Bollard for the treatment he administered to Kimple on March 17, 2000. Accordingly, the final three paragraphs of the Estate's proposed amendment constitute an entirely new allegation of negligence against Dr. Bollard personally, and not just an amplification of the theory contained in the amended complaint.

912 A.2d at 304 (emphasis added). This Court held, "The Estate was properly barred from introducing a new theory of the case against Dr. Bollard personally, as it had not put him on notice, before the statute of limitations had expired, that his actions on March 17, 2000 constituted the basis of its case against him." *Id.* at 307-08.[8]

---

[8] Although the Estate's complaint did not allege malpractice by Dr. Bollard after March 13, 2000, it did allege malpractice by Meadville after that date,
*(Footnote Continued Next Page)*

***Schweikert v. St. Luke's Hosp. of Bethlehem***, 886 A.2d 265 (Pa. Super. 2005), was another malpractice case. The plaintiff alleged that a piece of sponge was left inside her abdomen during one of three surgeries performed on January 10, January 12, and March 12, 1999, or "during the wound care of her infected abdominal wound . . . by the visiting nurses" at her home between January 27 and March 12, 1999. ***Id.*** at 267. More than two years later, during his trial deposition, the plaintiff's expert "added a third possible option on which the foreign material could have been introduced, that is during her post-operative hospitalization" between January 12 and January 27, 1999. ***Id.*** The trial court refused to permit the plaintiff to present that theory to the jury, because it was outside of her pleading and barred by the statute of limitations. At trial, the jury found in favor of the defendant hospital. On appeal, the plaintiff argued that the trial court erred in prohibiting her from presenting the expert's third theory and

*(Footnote Continued)* ———————————

asserting that Meadville's doctors, nurses, and other staff were negligent in that period in not recognizing Kimple's signs of distress and treating her appropriately in light of those signs. 912 A.2d at 307. This Court therefore held that even though the proposed amendment specifying negligence after March 13 stated a new time-barred claim against Dr. Bollard, it did not add a new claim against the hospital, because the complaint had already "clearly put [the hospital] on notice that the Estate was complaining about the care rendered by [the hospital]'s agents from March 13th to 17th." ***Id.*** at 307-08. As discussed below, the claim regarding Nurse Michels Mahler **did** add a new claim against the hospital, because the hospital was sought only to be held vicariously liable for Nurse Michels Mahler's conduct — not directly liable for corporate negligence relating to events in the TSU. This aspect of the case is therefore different from ***Chaney***.

in denying her leave to amend her complaint to add that theory to her pleading. We disagreed.

We first explained that the new theory advanced by the expert differed from what the complaint alleged and therefore was properly barred:

> [T]he theory advanced by the expert that the sponge could have been introduced into her abdomen during post operative hospitalization. . . . was advanced by the expert in a deposition . . . well after the statute of limitations had run. The trial court found that because the proposed testimony deviated from the pleadings, it should be precluded under the discovery rules . . . .

> [The plaintiff] argues that the trial court ignored the "fair scope" test for the expert's reports and/or that the language of her amended complaint subsumed the idea of negligent post operative care to account for the presence of the sponge. As to the first premise, [the plaintiff] would have us find the following language of the expert's report all encompassing:

> > Under no scenario can a physician or nurse be "excused" for leaving a sponge in a patient's abdominal wall or cavity and/or not finding (or discovering) a sponge after it has been left inside of a patient causing an infection.

> [The plaintiff] posits the notion that because the expert's (first) report discusses post operative wound care by visiting nurses, a suggestion that hospital nurses were responsible for introduction of the sponge could be extrapolated from the quoted passage, and would, therefore, come as no surprise. . . .

> . . . In his report, the expert expressly identified two possible time frames within which the introduction of the sponge might have occurred: during the surgical procedures of [January] or March of 1999, and during the ministrations of the visiting nurses after [the plaintiff]'s release from the hospital. No events during post surgical hospitalization are ever mentioned, and neither the general statement of practice nor any other section of the expert report refers to post operative hospital care. Accordingly, the trial court decision to exclude the expert's newly introduced theory was proper.

886 A.2d at 268-69 (citations omitted).

We then turned to the plaintiff's argument that she should have been allowed to amend her complaint to add her expert's new theory. The plaintiff contended that the theory was fairly encompassed by general language already included in the complaint, which alleged that the plaintiff received deficient post-operative care due to negligence "[i]n failing to properly diagnose and treat the abdominal infection of [the plaintiff] following the January 10, 1999 surgical procedure and continuing thereafter." 886 A.2d at 269. She relied on our statement in **Reynolds v. Thomas Jefferson Univ. Hosp.**, 676 A.2d 1205, 1209-10 (Pa. Super.), **appeal denied**, 700 A.2d 442 (Pa. 1996):

> General allegations of a pleading, which are not objected to because of their generality, may have the effect of extending the available scope of a party's proof, such that the proof would not constitute a variance, beyond which a party might have been permitted to give under a more specific statement.

We disagreed, stating:

> We are not persuaded that Appellant's eleventh-hour construction of this very vague language to constitute the instant claim is a mere amplification of an allegation in her complaint. Rather, the additional theory proposes another basis for recovery altogether, positing negligence committed by different tortfeasors during a different time frame. . . . Further, as the trial court accurately points out, this paragraph could only refer to a sponge left during surgery, the subject of the preceding six subparagraphs of the complaint.
>
> The **Reynolds** Court examined the holding of our Supreme Court in **Connor v. Allegheny General Hospital**, 501 Pa. 306, 461 A.2d 600 (1983), that a complaint may be amended after the statute of limitations has run in order to specify other forms of a defendant's negligence where the plaintiff does not seek to add new allegations of different negligent acts. The idea of pleadings is actually to convey notice of the intended grounds for

- 32 -

suit, not require the opponent to guess at their substance. . . . Even the most generous reading of the Rule permitting liberal allowance of amendment would not countenance the introduction of a new theory sought so late by Appellant. Here, too, the trial court's decision to deny Appellant's motion to amend was correct.

*Schweikert*, 886 A.2d at 269-70 (emphases added and some citations and footnotes omitted).

The facts of *Chaney* and *Schweikert* are similar to those presented here. In both *Chaney* and *Schweikert*, the malpractice plaintiff waited until after the statute of limitations had run and then sought to amend the complaint to allege claims based on medical treatment that occurred at a different time period than had been alleged. And in each case, this Court held that the plaintiff was properly barred from making that amendment, because it would introduce a new theory of the case as to which the defendant had not been put on notice before the statute of limitations had expired. *Chaney*, 912 A.2d at 302-04, 307-08; *Schweikert*, 866 A.2d at 267-70.

Here, the Shifletts' amendment added claims of improper medical treatment in the TSU after Ms. Shiflett's fall from her hospital bed. The claims rely on different facts — a failure to report symptoms that would lead to an earlier diagnosis — than those regarding the alleged negligence that caused Ms. Shiflett's fall. The time of the events is different, the location is different, and the personnel who are alleged to have engaged in the negligent conduct are different. While it is true that here, as in *Chaney* and

*Schweikert*, these events were part of a larger story regarding the plaintiff's medical care at the hands of a medical facility, they still are separate acts that had to be pleaded within the statute of limitations to place Lehigh Valley on notice of the claims and to enable Lehigh Valley to prepare a defense. *See Junk*, 396 A.2d at 1277-78 (emphasizing differences in defenses relating to old and new claims). Because the Shifletts' TSU claims presented a new basis for recovery that was not pleaded before the statute of limitations ran, the trial court erred in permitting amendment to add those claims.

We thus disagree with the trial court's holding that "the amendment did not change the causes of action asserted against [Lehigh Valley], but merely amplified what had already been asserted in the Amended Complaint." Trial Ct. Op. at 8. Notably, none of the trial court's citations to the Amended Complaint specifically discuss care in the TSU after April 15, 2012. Instead, the trial court considered the very general allegations relating to negligence following Ms. Shiflett's knee surgery — and, particularly, the general language in the subparagraphs of Paragraph 23 — to relate to everything that happened after April 12, 2012, including the events in the TSU after April 15. This same type of reliance on "very vague language" in a pleading was rejected by this Court in *Schweikert*, 886 A.2d at 269, and we hold that it was error here as well.

The Supreme Court addressed when general allegations of negligence can be used to expand negligence theories in a post-limitations amendment

in **Connor v. Allegheny Gen. Hosp.**, 461 A.2d 600 (Pa. 1983).  As part of emergency medical treatment at Allegheny General Hospital, the plaintiff, Mary Connor, was given a barium enema.  The barium leaked into her abdominal cavity through a perforation in her colon, causing serious injuries.  Connor sued, claiming the hospital was negligent in perforating her colon, causing the barium to leak into her abdomen, and "otherwise failing to use due care and caution under the circumstances."  461 A.2d at 601.  After the statute of limitations had run, Connor sought to amend her complaint to add an allegation that the hospital negligently delayed removing the barium from her abdomen.  The trial court denied leave to amend, but the Supreme Court reversed, holding that the amendment merely amplified the allegation that the hospital had failed "to use due care and caution under the circumstances."  **Id.** at 602.  The Court then added:

> If appellee did not know how it "otherwise fail[ed] to use due care and caution under the circumstances," it could have filed a preliminary objection in the nature of a request for a more specific pleading or it could have moved to strike that portion of appellants' complaint.  **Compare Arner v. Sokol**, 373 Pa. 587, 592-93, 96 A.2d 854, 856 (1953), citing **King v. Brillhart**, 271 Pa. 301, 114 A. 515, 516 (1921) ("[T]he [plaintiff's statement] may not be a statement in a concise and summary form of the material facts upon which the plaintiff relies . . .; but, if not, it was waived by defendant's affidavit to and going to trial upon the merits . . . a defendant may move to strike off an insufficient statement, or, if it is too indefinite, may obtain a rule for one more specific.  Failing to do either, he will not be entitled to a compulsory nonsuit because of the general character of plaintiff's statement.").  In this case, however, appellee apparently understood this allegation of appellants' complaint well enough to simply deny it in its answer.  Thus, appellee cannot now claim that it was prejudiced by the late amplification of this allegation in appellants' complaint.

*Id.* at 602 n.3. It is in light of this qualification that this Court stated in *Reynolds*, 676 A.2d at 1209-10, that "[g]eneral allegations of a pleading, **which are not objected to because of their generality**, may have the effect of extending the available scope of a party's proof."

Here, however, the general averments in the Amended Complaint on which the trial court relied **were** objected to by Lehigh Valley. In preliminary objections to the Amended Complaint (and, indeed, in similar objections to the original Complaint), Lehigh Valley asked that they be stricken or dismissed because they were too "general, vague and overbroad" in failing to specify exactly what misconduct was being referenced. The Shifletts responded to Lehigh Valley's objections by, in effect, providing a more specific statement of what they were alleging. They emphasized that the allegations "cannot be read in isolation" and then summarized the "detailed and specific allegations" that supported the more general averments. All of those specific allegations related to Ms. Shiflett's fall in the PSU and none related to alleged misconduct in the TSU. The trial court overruled Lehigh Valley's preliminary objections after receiving the Shifletts' explanation.

Viewed in this context, the trial court erred in holding that the general averments in Paragraph 23 of the Amended Compliant put Lehigh Valley on notice of a claim regarding malpractice in the TSU after April 15, 2012. The Amended Complaint made no reference to such events, and the Shifletts'

explanation of the general averments made clear that they were speaking of Ms. Shiflett's fall from her bed, not anything that occurred days later in the TSU. Lehigh Valley was entitled to rely on the representations made in that explanation.

Under **Connor** and **Reynolds**, it was error for the trial court to allow the new negligence claim in the Second Amended Complaint on the basis of Paragraph 23's general allegations. The TSU allegations were no "mere amplification of an allegation in [the earlier] complaint," but instead alleged "another basis for recovery altogether, positing negligence committed by different tortfeasors during a different time frame." **Schweikert**, 886 A.2d at 269. Because the Second Amended Complaint was filed after the statute of limitations had run, the Shifletts' vicarious liability claims based on those new allegations were time-barred.

## Corporate Negligence

### Statute of Limitations

We have concluded that the Shifletts' vicarious liability claim relating to the TSU was time-barred, but Lehigh Valley argues further that "the trial court erred in allowing the Shifletts' corporate negligence claim related to the care provided in the TSU or by Nurse [Michels] Mahler to go to the jury because the claims were barred by the statute of limitations" also. Lehigh Valley's Brief at 25.

The Shifletts respond that Lehigh Valley "waived any objection to the corporate negligence verdict," because "on the record after the close of [the

Shifletts'] case, counsel for both [the Shifletts] and [Lehigh Valley] agreed that the corporate negligence claim was limited to the fall itself, not the care in the TSU." Shifletts' Brief at 9 (citing N.T., 2/8/16, at 4-5). The Shifletts also contend that the "record evidence supports the corporate negligence verdict." *Id.* at 16. In other words, the Shifletts contend that the corporate negligence claim cannot be time-barred because it is not based on any allegations relating to the events in the TSU. *See id.* at 9, 16. The trial court agreed with the Shifletts that Lehigh Valley "waived any challenge to the jury's verdict as to the corporate negligence claim," because both sides agreed during trial that "the corporate negligence claim was against [Lehigh Valley] for failing to train and supervise the [PSU] nurses in fall prevention strategy[,]" adding that "the corporate negligence claim did not assert any wrongdoing against Nurse Michels Mahler in the TSU." Trial Ct. Op. at 15-16 (citing N.T., 2/8/16, at 4-5; N.T., 2/9/16, at 9-10).

The record reveals that the parties agreed, both parties' counsel argued, and the trial court instructed as follows: Question 1 on the verdict sheet referred to Lehigh Valley's vicarious liability for events in the PSU; Question 3 on the verdict sheet related to Lehigh Valley's vicarious liability for events in the TSU; and Question 5 addressed Lehigh Valley's corporate liability. N.T., 2/8/16, at 4-6; N.T., 2/9/16, at 9-10, 44-45, 52-53, 109, 113-14. Further, the parties agreed that there was no claim for corporate negligence of Lehigh Valley with respect to events in the TSU. N.T., 2/8/16, at 4-6. Neither party argued to the jury that there was a claim against

Lehigh Valley for corporate negligence in the TSU.  *See* N.T., 2/9/16, at 44-45, 52-53.  Lehigh Valley did not seek a jury instruction seeking clarification of the limited scope of this claim or object to the absence of such a clarification from the instruction.  We therefore agree with the trial court that any argument by Lehigh Valley that the corporate negligence claim extends to negligence in the TSU was waived. The corporate negligence claim therefore could not have been barred by the statute of limitations.

## *Consistency of the Verdict*

Lehigh Valley also argues that "the trial court erred in not granting a [judgment notwithstanding the verdict ("JNOV")] when the jury's verdict was inconsistent (finding Nurse Langham not negligent but finding [Lehigh Valley] negligent for failing to properly train her)."  Lehigh Valley's Brief at 48.  Lehigh Valley contends:

> The evidence at trial to support the Shifletts' corporate negligence claim was grounded in the alleged improper training of Nurse Langham (in the [PSU]) on [Lehigh Valley]'s fall prevention policies.  The jury found that Nurse Langham did NOT commit negligence.  Yet the jury also found [Lehigh Valley] liable for corporate negligence. . . . Given these inconsistent verdict findings, the trial court should have entered a JNOV on the corporate negligence claim.

*Id.* at 48-49 (emphasis in original; citations to the record omitted; citing *Thompson v. Nason Hosp.*, 591 A.2d 703 (Pa. 1991); *Kit v. Mitchell*, 771 A.2d 814, 818-19 (Pa. Super. 2001)).  The Shifletts reply that "the jury verdict is consistent and even if it were not, [Lehigh Valley] has waived any objection."  Shifletts' Brief at 29.

"[I]f a party seeks relief upon grounds of verdict inconsistency, it must forward a timely, contemporaneous objection **upon the rendering of the verdict**." **Criswell v. King**, 834 A.2d 505, 513 (Pa. 2003) (emphasis added). Here, Lehigh Valley did not object to any inconsistency between the verdict regarding Nurse Langham and the verdict on corporate negligence at the time they were entered. N.T., 2/9/16, at 130. Thus, it has failed to preserve this challenge.

In addition, we find no inconsistency between the verdicts. Our law on how to address inconsistent verdicts is as follows:

> Generally, inconsistencies in jury verdicts are not permissible in civil actions in the Commonwealth. Inconsistency mandating a new trial most often occurs when a jury returns a verdict assessing liability on the part of a principal while finding no liability on the part of the agent when the only foundation for the principal's liability is the imputed negligence of the agent under the doctrine of respondeat superior. However, every reasonably possible intendment is to be made in favor of the findings of a jury, and *an inconsistency may justifiably be declared to exist only if there is no reasonable theory or conclusion to support the jury's verdict.*

**Walsh v. Pa. Gas & Water Co.**, 449 A.2d 573, 576 (Pa. Super. 1982) (emphasis in original; citations and quotation marks omitted); **see also McDermott v. Biddle**, 674 A.2d 665, 667 (Pa. 1996) (in civil cases, jury verdicts are presumed to be consistent "unless there is no reasonable theory to support the jury's verdict"); **Goldmas v. Acme Markets, Inc.**, 574 A.2d 100, 103 (Pa. Super. 1990) ("there is a presumption of consistency with respect to a jury's findings which can only be defeated when there is no

reasonable theory to support the jury's verdict" (citation omitted)). We conclude that it is reasonable to construe the verdicts here to be consistent.

The verdict regarding Nurse Langham addressed her own personal conduct in the PSU and her failure to prevent Ms. Shiflett's fall. The verdict regarding corporate negligence addressed Lehigh Valley's conduct in setting policies and procedures for fall-prevention in the PSU. As the Supreme Court stated in **Welsh v. Bulger**, 698 A.2d 581 (Pa. 1997):

> [C]orporate negligence is based on the negligent acts of the institution. A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees. Thus, under this theory, a corporation is held directly liable, as opposed to vicariously liable, for its own negligent acts.

698 A.2d at 585 (internal citations omitted). Thus, in proving corporate negligence, "an injured party does not have to rely on and establish the negligence of a third party," including a corporate employee. **Thompson**, 591 A.2d at 707 (footnote omitted).

> "Pennsylvania recognizes the doctrine of corporate negligence as a basis for hospital liability separate from the liability of the practitioners who actually have rendered medical care to a patient." **Rauch v. Mike–Mayer**, 783 A.2d 815, 826 (Pa. Super. 2001) (citation omitted). The doctrine of corporate negligence imposes a non-delegable duty on the hospital to uphold a proper standard of care to patients. **Id.**

**Seels v. Tenet Health Sys. Hahnemann, LLC**, 167 A.3d 190, 205 (Pa. Super. 2017). Thus, the fact that the jury found that Nurse Langham was not negligent in causing Ms. Shiflett's injuries does not preclude a finding that the injuries were caused by Lehigh Valley's corporate negligence.

At trial, Nurse Balkstra testified that Lehigh Valley had appropriate fall prevention guidelines in place, but that they were not appropriately used because the staff were not educated frequently enough about them. N.T., 2/3/16, Tr. of Cynthia Balkstra, at 44-46, 69-70. She also testified that Lehigh Valley's failure to train its nursing staff appropriately about how to use the fall prevention guidelines increased the risk of Ms. Shiflett falling. *Id.* at 70. On the basis of this testimony, the jury may have held Lehigh Valley liable for a failure to properly train and supervise its staff about prevention of falls. *See Rauch v. Mike–Mayer*, 783 A.2d 815, 826-27 (Pa. Super. 2001) (doctrine of corporate negligence imposes a non-delegable duty on a hospital if it fails to oversee those practicing medicine within its walls as to patient care and fails to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients). Consistent with such a finding, the jury also could have concluded that Nurse Langham was not properly trained to implement appropriate fall-prevention procedures and therefore was not personally responsible for Ms. Shiflett's fall.

Accordingly, after making every possible intendment in favor of the jury's findings and after considering every reasonable theory to support the verdicts, we conclude that the trial court did not err in holding that the jury's finding of corporate negligence was consistent with its finding that Nurse Langham was not negligent. *See Reott,* 7 A.3d at 835; *McDermott*, 674 A.2d at 667; *Goldmas*, 574 A.2d at 103; *Walsh*, 449 A.2d at 576. Therefore, Lehigh Valley's argument on this issue is meritless.

**Scope of Dr. Erickson's Testimony**

Lehigh Valley raises one evidentiary issue that relates to liability: "the trial court erred in allowing the Shifletts' liability expert, Dr. Erickson, to testify beyond the fair scope of his report." Lehigh Valley's Brief at 41. We review this issue for an abuse of discretion, as "[a]dmission or exclusion of evidence rests within the sound discretion of the trial court, and we will not reverse the court absent an abuse of discretion or error of law." **Webb v. Volvo Cars of N. Am., LLC**, 148 A.3d 473, 484 (Pa. Super. 2016), **appeal denied**, 168 A.3d 129 & 168 A.3d 1294 (Pa. 2017).

> Lehigh Valley argues:

> The Shifletts' liability expert, Dr. Erickson, provided a short, two and a half page report during discovery in this case. . . . Dr. Erickson also was allowed to testify, over [Lehigh Valley]'s objections, on physical therapy evaluations, including range of motion assessments, before and after her fall which had never been addressed in his report. . . . Dr. Erickson was further allowed to testify, over [Lehigh Valley]'s objection, as to his conclusions about the significance of [Ms.] Shiflett's reports of "sharp pain" – again, an opinion not discussed in his report.

**Id.** at 41-42, 44 (citing Rep. of Dr. Erickson, 7/6/15; N.T., 2/5/16, at 34-37, 54-55). The Shifletts reply that "Dr. Erickson's testimony did not go beyond the fair scope of his report and caused no prejudice to [Lehigh Valley]." Shifletts' Brief at 46. They continue:

> [Lehigh Valley's] arguments are clearly contradicted by a plain reading of Dr. Erickson's report and there is no genuine argument that [Lehigh Valley] was surprised or prejudiced. . . . In light of Dr. Erickson's expert report specifically opining about [Ms.] Shiflett's substantial trauma and non-displaced fracture, his trial testimony was clearly within the fair scope of his opinion. . . . Lehigh Valley['s] objection is not only contrary to

the law, but is completely impractical. . . . Dr. Erickson began his report by indicating that he reviewed all of the relevant medical records, including the records from "Lehigh Valley Hospital." . . . Even if Dr. Erickson's reference to one physical therapy note in the Lehigh Valley Hospital chart was somehow outside the fair scope of his opinion, it was harmless error.

*Id.* at 46, 48-50. In resolving this dispute, the trial court found that "Dr. Erickson's report was sufficient to include the testimony he provided regarding the surgery and his testimony regarding how the fall resulted in trauma to Ms. Shiflett's knee and to further testify at trial that she suffered a non-displaced fracture." Trial Ct. Op. at 27.

The parties and the trial court all rely upon Pa.R.C.P. 4003.5(c):

To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under . . . this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

In ***Callahan v. Nat'l R.R. Passenger Corp.***, 979 A.2d 866 (Pa. Super. 2009), ***appeal denied***, 12 A.3d 750 (Pa. 2010), this Court stated:

Pa.R.C.P. 4003.5(c) does provide that the direct testimony of an expert may not be inconsistent with or go beyond the fair scope of the materials which have been developed during discovery.

In deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." The question to be answered is whether, under the circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

We review a trial court's ruling on this type of issue for an abuse of discretion.

*Id.* at 876-77 (citations omitted).

We agree with the trial court that Dr. Erickson's specific testimony at trial is consistent with the fair scope of his report. In his report, Dr. Erickson stated that he reviewed Lehigh Valley's own records and, based on those records, concluded that Ms. Shiflett's fall resulted in the trauma to her knee. In his trial testimony, Dr. Erickson specified which Lehigh Valley records he reviewed, including the physical therapy range-of-motion assessments, to deduce that Ms. Shiflett was not improving from the surgery as expected. N.T., 2/5/16, at 34-37, 54-55. Thus, Dr. Erickson's testimony did not present a new theory, and it was not inconsistent with his report. *See* *Callahan*, 979 A.2d at 876-77. The trial court hence did not abuse its discretion in permitting Dr. Erickson to testify about Ms. Shiflett's physical therapy assessments.

**Damages and Retrial**

Lehigh Valley's remaining arguments all relate to the damages award. We need not reach Lehigh Valley's specific damages issues, however, because our holding that it was error to permit trial of the Shifletts' time-barred claim regarding negligence by Nurse Michels Mahler requires that there be a new trial on, at the least, the issue of damages. It is impossible to determine from the verdict sheet (which did not break down damages by claim) whether all of the damages awarded by the jury were caused by Ms.

Shiflett's fall in the PSU, or whether some portion of those damages was the result of the negligence found to have taken place in the TSU. On remand, there must be a new determination of damages that is limited to those caused by the corporate negligence in the PSU.[9]

The remaining question is whether the new trial should be limited to only a determination of what amount of damages was caused by the corporate negligence that led to Ms. Shiflett's fall in the PSU, or whether there should be a new trial on liability as well. A court has discretion to hold a new trial solely on the issue of damages if: "(1) the issue of damages is not 'intertwined' with the issue of liability, and (2) . . . the issue of liability has been 'fairly determined.'" **Mirabel v. Morales**, 57 A.3d 144, 152 (Pa. Super. 2012); **see Kiser v. Schulte**, 648 A.2d 1, 7-8 (Pa. 1994); **Troncatti v. Smereczniak**, 235 A.2d 345, 346 (Pa. 1967); **Kraner v. Kraner**, 841 A.2d 141, 147 (Pa. Super. 2004); **Lambert v. PBI Indus.**, 366 A.2d 944, 955-57 (Pa. Super. 1976). "[L]iability is not intertwined with damages when the question of damages is readily separable from the issue of liability." **Mirabel**, 57 A.3d at 152 n.8. The liability issue has been "fairly determined"

_____

[9] On remand, the trial court is free to revisit the damages issues raised by Lehigh Valley in this case. On Lehigh Valley's Issue D regarding reduction of life care expenses to present value, we direct the parties' attention to **Tillery v. Children's Hosp. of Phila.**, 156 A.3d 1233 (Pa. Super. 2017), which was decided by this Court after the parties filed their briefs in this case. On Issue C, regarding admissibility of the criminal history of Ms. Shiflett's son, the court is free to reweigh the competing arguments as it exercises its discretion under Rule 403 of the Rules of Evidence, noting both the potential for prejudice and potentially high probative value of the proffered evidence.

when liability has been found "on clear proof" under circumstances that would not cause the verdict to be subject to doubt. *Lambert*, 366 A.2d at 956. Here, we have resolved the issues raised by Lehigh Valley regarding the propriety of the liability verdict regarding its corporate negligence, and it appears to us that the damages issue is readily separable from that liability issue. We therefore see no impediment to limiting the new trial to damages issues.

In this situation, a limited new trial is the preferred course. In *McNeil v. Owens-Corning Fiberglas Corp.*, 680 A.2d 1145 (Pa. 1996), a jury properly rendered a verdict in favor of the defendant on the plaintiff's claim that his cancer was caused by exposure to asbestos, but the trial court erred in failing to present to the jury the plaintiff's claim that asbestos exposure caused his non-malignant injuries. This Court ordered a new trial on all issues, but the Supreme Court reversed that aspect of our decision, instructing:

> This Court has consistently held that where the only trial errors disclosed in the record deal with specific and discrete issues, the grant of a new trial should be limited to those issues. In *Messer v. Beighley*, 409 Pa. 551, 187 A.2d 168 (1963), this Court held that where errors deal exclusively with damages, the new trial should be limited to damages. Likewise, in *McKniff v. Wilson*, 404 Pa. 647, 172 A.2d 801 (1961), we held that since the only meritorious assignments of error involved damages, retrial should concern that issue alone. . . . The new trial ordered in the instant case, therefore, should be limited to the non-cancer claims, the lung cancer claim having already been fully litigated and resolved by a jury.

680 A.2d at 1148.

The Supreme Court followed this course in ***Quinby v. Plumsteadville Family Practice, Inc.***, 907 A.2d 1061 (Pa. 2006), in which it ordered a new trial limited to determining whether the plaintiff's alleged injury was caused by the negligence established at trial. Coincidentally, ***Quimby*** was another medical malpractice case relating to a fall in a hospital.[10] That time, however, the patient died. The Supreme Court held that on the facts proven at trial, the decedent's estate was entitled to a judgment in its favor on the issue of negligence. 907 A.2d at 1075-77. But there remained a question whether the decedent's death resulted from his injuries in the fall. Because negligence already had been established, the Court held that on remand, "the only factual issue for the jury to determine is whether Decedent's death resulted from injuries sustained during the fall, thus warranting recovery of those damages peculiar to a cause of action for wrongful death." ***Id.*** at 1077.

We followed this same course in ***Shiner v. Moriarty***, 706 A.2d 1228 (Pa. Super.), ***appeal denied***, 729 A.2d 1130 (Pa. 1998). The plaintiff in that case prevailed at trial on claims of abuse of process, wrongful use of civil proceedings, and intentional interference with contractual relations, but the jury did not apportion damages among each of the claims. After reversing the judgment on the latter two claims, we held that a new trial on remand should be limited to determining the amount of damages that were caused by the abuse of process, explaining:

---

[10] The patient in ***Quimby***, a quadriplegic, fell from an examination table.

The damages were assessed without regard to each specific cause of action. It is impossible to determine what portion of those damages was attributable to the equity and ejectment proceedings upon which liability was found for abuse of process. We find that a new trial on the issue of damages is warranted in these circumstances.

706 A.2d at 1242.

Informed by these decisions, we remand for a new trial to determine what damages were caused by Lehigh Valley's corporate negligence relating to Ms. Shiflett's fall in the PSU.[11]

Judgment vacated. Case remanded for a new trial consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/9/2017

---

[11] Our decision on this issue is hampered by the fact that the trial court has not had an opportunity to opine on the appropriate scope of any retrial, and the parties have had no cause to brief this issue before now. In light of this fact, our remand is without prejudice to the authority of the trial court to consider whether matters not brought to our attention caution against limiting the retrial because, for example, the questions of damages and liability are more closely intertwined than we have perceived. The trial court may depart from our mandate only as to the scope of any retrial, and any such departure must be supported by an appropriate record and explanation.